Adam M. Apton (SBN 316506)
**LEVI & KORSINSKY, LLP**
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Plaintiff*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARLIE DOLLY, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **CLASS ACTION** |
| GITLAB INC., SYTSE SIJBRANDIJ, AND BRIAN G. ROBINS, | <u>Demand for Jury Trial</u> |
| Defendants. | |

Plaintiff Arlie Dolly ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made by GitLab Inc. ("GitLab" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of GitLab's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired GitLab securities between June 6, 2023 and March 4, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning GitLab's expected revenue for the fiscal year 2025. Defendants' statements included, among other things, GitLab's AI incorporation throughout its DevSecOps platform, developing new AI features to increase efficiency of software development and making it more affordable for customers, monetizing its various AI capabilities with monthly subscriptions and increasing pipeline growth by integrating its DevSecOps platform as the preferred software delivery platform in the industry.

3. Defendants created the false impression that they possessed reliable information pertaining to the Company's ability to develop and incorporate AI throughout the software development cycle in order to optimize code generation thereby increasing market demand and

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

making all levels of software development more affordable and properly monetizing its AI features. In truth, there was weak market demand for Gitlab's touted AI features and the Company was incurring an increasing amount of expenses involving JiHu, its joint venture in China, as well as the annual company-wide summit. Defendants misled investors by continually highlighting its AI-driven innovations to develop software more efficiently and drive market share demands.

4.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning GitLab's ability to develop AI features that would generate code more efficiently and increase market demand for its DevSecOps platform.

5.     The truth emerged on March 4, 2024, when GitLab issued a press release reporting a strong Q1 in 2024, followed by an announcement lowering full-year guidance for 2025. In pertinent part, Defendants announced that the company needed time to build its pipeline and close deals on new products. In addition, provided first quarter 2025 and full year 2025 guidance with growth rates hovering between 30 and 31% and 27%, respectively. Furthermore, GitLab anticipated a Q1 2025 non-GAAP operating loss of $12-$13 million and an operating non-GAAP revenue of $5-$10 million for the full year of 2025.

6.     Investors and analysts reacted immediately to GitLab's revelation. The price of GitLab's common stock declined dramatically. From a closing market price of $74.47 per share on March 4, 2024, GitLab's stock price fell to $58.84 per share on March 5, 2024, a decline of about 21% in the span of just a single day.

## JURISDICTION AND VENUE

7.     Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as GitLab is incorporated in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **THE PARTIES**

12.    Plaintiff purchased GitLab common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in GitLab is attached hereto.

13.    GitLab, Inc. is a Delaware corporation with its principal executive offices located at 268 Bush Street #350, San Francisco, CA 94104-3503. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "GTLB."

14.    Defendant Sytse Sijbrandij ("Sijbrandij") was, at all relevant times, Co-Founder, Chairman and Chief Executive Officer of GitLab.

15.    Defendant Brian G. Robins ("Robins") was, at all relevant times, the Chief Financial Officer of GitLab.

16.    Defendants Sijbrandij and Robins are sometimes referred to herein as the "Individual Defendants." GitLab together with the Individual Defendants are referred to herein as the "Defendants."

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of GitLab's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional

investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     GitLab is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to GitLab under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20.     GitLab is a global software company that designs and develops software solutions. GitLab began as an open-source project and currently offers a platform for authentication, authorization, DeVops score, audit and value stream, management.

21.     GitLab's core offering is as a DevOps platform that enables professionals to perform project-based tasks, from the planning stage to source code management to monitoring and security.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***The Defendants Materially Misled Investors Concerning***

***GitLab's Revenue Outlook for 2025***

<u>*June 5, 2023*</u>

22.     On June 5, 2023 GitLab held a first quarter earnings call wherein Defendant Robins noted the investments made by GitLab to drive its AI vision stating, in part:

> Now on to the way we are thinking about the financials and the impact of our AI products. ***We continue to invest in people and infrastructure to support AI. While we have had some teams working on AI features, we recently shifted additional engineers from other teams to support the work on AI.*** As a result, this has not led to significant incremental expenses on engineering talent. ***Additionally, we have made investments in our cloud provider spend to support our AI and R&D efforts. In addition, we also continue to leverage partners to help drive our AI vision.*** This has included partnership announcements with Google Cloud and Oracle. The Google partnership allows us to use Google Cloud AI functionality to make our own AI offerings better by leveraging their tool set. The partnership with Oracle makes it easier for our customers to deploy their own AI and machine learning workloads using Oracle's Cloud Infrastructure. Both of these partnerships help create strategic differentiation for our customers in a financially responsible manner.

(Emphasis added.)

23.     On the same call, Defendant Robins again spoke about the forecasted expenses related to JiHu, stating in part:

> Separately, I would like to provide an update on JiHu, our China joint venture. Our goal remains to deconsolidate JiHu. However, we cannot predict the likelihood or timing of when this may potentially occur. Thus, for modeling purposes for FY '24, we now forecast approximately $29 million of expenses related to JiHu compared with $19 million in FY '23. These JiHu expenses represent approximately negative 5% of our total implied negative 8% non-GAAP operating loss for FY '24.

24.     During the question-and-answer segment, Defendant Sijbranij was asked about GitLab's AI-related revenue opportunities.

<Q: James Derrick Wood – TD Cowen – Analyst> And then just from a broader perspective, how you're thinking about the gen AI-related revenue opportunities in the quarters ahead?

<A: Sytse Sijbrandij> So we're really excited about our partnership with Oracle Cloud. They have a great customer base. And what it means is that our customers now can now run AI and ML workloads on GPU-enabled GitLab Runners on the Oracle Cloud Infrastructure, and that's a great powerful infrastructure. Additionally, we're available in Oracle's marketplace, expanding our distribution.

So our strategy, with AI in mind, is to partner closer with the hyperscalers. And the toughest one is Microsoft. We try to partner there too. But with everyone else, we see a lot of momentum, and that's AWS, GCP and Oracle. We want to get closer. We want to enable our customers to run their normal workloads, their AI workloads there, and where you can expect us to have more announcements going forward.

. . .

<Q: Kasthuri Gopalan Rangan – Goldman Sachs – Analyst> I had a question on the generative AI capabilities. At what point are we looking to -- is there any need for further differentiation of GitLab versus the competition? This auto code generation feature that has been made much off, right, is that a real sticking point in conversations? Do you think the customer base really values and appreciates the broader set of AI capabilities that GitLab has to offer?

<A: Sytse Sijbrandij> So we're really fortunate that we have a single application, a single data store for the entire DevSecOps cycle, and we can apply AI to all of them. And that's led us to having 3x as many publicly usable AI features as our competition. That is a big advantage. As long as at the beginning that, of course, you also need the code suggestions. But having the whole rest make sure that if you get more effective there, it works, and you get a faster cycle time throughout, and that's a really exciting development.

*September 5, 2024*

25.    GitLab held a second quarter earnings call on September 5, 2024 where management once again touted its AI-powered capabilities and potential to drive in revenue. Defendant Sijbrandij stated in pertinent part:

AI continues to be a key area of product innovation. We are developing AI-powered capabilities across the entire software development life cycle. Let me share just a few of these capabilities. Code suggestions uses generative AI to suggest code to developers. Suggested reviewers leverages AI to identify the most appropriate

reviewers of code. Explaining this vulnerability provides details about potential security vulnerabilities in code. And code suggestions remains on track to be generally available later this year. We differentiate our approach to AI in several ways. We have a commitment to privacy and transparency in our use of AI, and we also deliver AI throughout the entire software development life cycle.

Today, we released the findings of our state of DevSecOps study. This study illustrates the importance of our AI differentiation even further. In June 2023, we surveyed more than 1,000 respondents. These include in-video contributors and leaders in software development, IT operations and security. We found that 79% of respondents are concerned about AI tools accessing private information or intellectual property. We also found that developers only spend 25% of their time writing code. And that's why we believe delivering AI beyond just code suggestions is essential.

26.     On the same call, Defendant Robins announced plans to monetize the Company's AI capabilities. In addition he provided an update on the continuing goal to deconsolidate JiHu stating in pertinent part:

We remain on track to achieve free cash flow breakeven for FY '25. There are a number of drivers we are introducing that we believe should help fuel our business in FY '25. I touched on the first one earlier, which is the price increase in our premium tier. Additionally, in Q2, we started enforcing user limits on our free SaaS tier. It's early, but we have seen additional free users upgrade to premium. The third driver is the launch of Dedicated. This allows us to address new opportunity from companies with complex security and compliance requirements. ***Finally, we plan to monetize our AI capabilities by launching an add-on that will include code suggestions functionality later this year.***

Separately, I would like to provide an update on JiHu, our China joint venture. Our goal remains to deconsolidate JiHu. However, we cannot predict the likelihood or timing of when this may potentially occur. Thus, for modeling purposes for FY '24, we now forecast approximately $25 million of expenses related to JiHu compared with $19 million in FY '23.

(Emphasis added.)

27.     During the question-and-answer segment, Defendant Sijbranij was asked about customer feedback as to GitLab's pricing increase.

<Q: William Fitzsimmons – Moffett Nathanson – Analyst> Obviously, a few months ago, the firm held discussion with investors to talk through the generative AI-based products and then you gave us an update on Duo in AI in the prepared

remarks. But maybe double-clicking and going a little deeper, and I can't imagine we're still in the early innings here. But curious if you could talk through kind of early customer feedback on these products' adoption trends, what you're hearing and seeing?

<A: Sytse Sijbrandij> Customers get that they need AI features, not just for example, coding, but they need them throughout the DevOps life cycle…We're really happy that we have 10 features out there already. And some of the oldest feature we have suggested reviewers has over 100,000 users today. So we're excited about progressing that further. And it's great to see that customers recognize that they need a suite of AI features, and therefore, we're excited about Duo.

. . .

<Q: William Fitzsimmons – Moffett Nathanson – Analyst> For Sid, for those customers who are evaluating adding large language model features to their DevOps platform today, are they still mostly focused on code suggestions? Or is there increasingly other considerations at play as these customers get smarter and more in the leads on AI?

<A: Sytse Sijbrandij> Yes. I think as customers get more sophisticated, they're seeing that AI should be throughout the life cycle. As mentioned earlier in this call, like it's DevSec and Ops, like you need those AI features too to make security more efficient. If you just produce more co, that's not going to do it. And of those developers producing more co, that's not the only thing they need.

So as customers get more sophisticated, they want more AI features, and we're really happy that we have 10 features out already. The second thing they want is good guarantees of privacy that their intellectual property is never going to be used to enhance other people their platform, their intellectual property. So I think in both, we have a really compelling story.

*December 4, 2024*

28.     On December 4, 2024 GitLab held a third quarter earnings call wherein Defendant Sijbrandij reiterated the numerous AI features available and how it has resonated with customers stating in pertinent part:

Now I'd like to discuss our second topic, which is our unique approach to AI. We already have 14 AI features available to our customers. That's more than any other DevSecOps platform we continue to innovate. GitLab Duo is our suite of AI-powered DevSecOps workflows that enables customers to boost speed and efficiency without sacrificing privacy, security and compliance.

. . .

Our approach to AI is resonating with our customers. For example, Amado Gramajo, Vice President of Infrastructure & DevOps at Nasdaq, recently shared his excitement about how Gitlab Duo will help Nasdaq protect their intellectual property and stay in line with regulatory mandates. And presenting at this year's Gartner Application Innovation Summit, Bal Kang at NatWest said, "GitLab Duo enables our developers to be more productive, efficient and successful in creating secure code. We're excited to see the benefits of GitLab's AI features across the entire value chain, and even our most seasoned engineers are seeing value."

29.     During the question-and-answer segment, Defendant Sijbranij was asked about customer feedback regarding GitLab's AI functionality.

<Q: Kasthuri Gopalan Rangan – Goldman Sachs – Analyst> And second and final, the -- we've been waiting for Google to more closely align or for you to closely align your generative AI efforts with Google. How close or how far are we from a full-blown integration and announcement of sorts?

<A: Sytse Sijbrandij> Yes, the customer feedback on our AI functionality has been positive. And as you might have heard in the prepared remarks, customers like NatWest and Nasdaq are using it in their engineering teams and seeing the value and the productivity and efficiency that it brings.

Our customers have reported efficiency improvements upwards of 50% with Code Suggestions. We recently spoke with a leading international travel agency, and they said that the features they tested, they believe that GitLab offers a better quality there. We also spoke with a multinational financial technology company, and their team is excited about using GitLab Duo for generating configurations, test generation, book finding and automating operational work. So we're very excited that we have a broad platform so that we can do AI across the life cycle with 14 features for customers available today.

30.     The above statements in Paragraphs 22 to 29 were false and/or materially misleading. Defendants created the false impression that possessed reliable information pertaining to the Company's ability to develop and incorporate AI throughout the software development cycle in order to optimize code generation thereby increasing market demand and making all levels of software development more affordable and properly monetizing its AI features. In truth, there was weak market demand for Gitlab's touted AI features and the Company

was incurring an increasing amount of expenses involving JiHu, its joint venture in China, as well as the annual company-wide summit. Defendants misled investors by continually highlighting its AI-driven innovations to develop software more efficiently and drive market share demands.

### GitLab Reveals Fourth Quarter and Fiscal Year 2024 Earnings and Reveals Lower-than-Expected Guidance for Fiscal Year 2025

<u>March 4, 2024</u>

31.     On March 4, 2024, GitLab issued a press release reporting strong Q1 2024 results and then immediately following this with a disclosure announcing lower than expected full-year guidance for 2025. GitLab attributed it to time needed to "build pipeline and close deals on new products."

32.     Later the same day, Defendant Robins spoke on an earnings call disclosing guidance for FY2025:

> With that said, our guidance for first quarter of FY 2025. We expect total revenue of $165 million to $166 million, representing a growth rate of 30% to 31% year-over-year. **We expect a non-GAAP operating loss of $13 million to $12 million. The loss includes an approximately $15 million expense related to our in-person company-wide summit.** As an all-remote company, we're thrilled to bring team members together in the same location for the first time since 2019. And we expect non-GAAP net loss per share of $0.05 to $0.04, assuming 158 million weighted average basic shares outstanding.
>
> For the full year FY 2025, we expect total revenue of $725 million to $731 million, representing a growth rate of approximately 26% year-over-year. We expect a non-GAAP operating income of $5 million to $10 million, and we expect non-GAAP net income per share of $0.19 to $0.23, assuming 168 million weighted average diluted shares outstanding. We believe that our continued focus on responsible growth will yield further improvements in our unit economics. We plan to be free cash flow positive again in FY '25, excluding any nonrecurring cash tax payments related to the bilateral advanced pricing agreement.

(Emphasis added.)

33.     In a question-and-answer portion, analysts questioned the conservative guidance provided by GitLab:

<Q: Kasthuri Gopalan Rangan – Goldman Sachs – Analyst> With all these levers that Sid is talking about, why is the guidance seemingly conservative?

<A: Brian G. Robins> Yes, we do have a number of growth drivers for FY '25 and beyond. I think you've named a number of them. It takes a while to build pipeline and close deals on new products. And so the total number of revenue that we have for next year for it to make a meaningful impact in a ratable business model is going to take a little while for that to come to fruition.

. . .

<Q: James Derrick Wood – Analyst> I guess in the context of this, it looks like your guidance of 25% to 26% revenue growth for fiscal '25 would be conservative. So just 2 questions. Are there any drags in the model we should be aware of that may not be reflected in the backlog or the trailing 12-month NRR numbers? And then is it fair to say you think that growth tailwinds from pricing and from AI will be higher in fiscal '26 versus fiscal '25?

<A: Brian G. Robins> The points that you made obviously are all true and valid. The revenue growth of 33% are guided 26% next year. That factors in the buying behavior and the normalization that we've seen in the market. We do have a ratable model. And then being a -- entering our third year as a public company, that's when we're -- we said our guidance was to be less conservative than the prior 2 years. And so I think the setup with the new products and the normalization of buying behavior as well as the metrics that we put up this quarter is a good setup for next year.

. . .

<Q: Jason Noah Ader – William Blair – Analyst> Brian, just trying to square, I guess, with everybody else the guidance with the less conservative posture comment. In particular, if NRR is trending up and is around 130%, doesn't this imply that NRR would have to decline from here for revenue growth to be in the mid-20s?

<A: Brian G. Robins> There's a number of factors that go into our guidance. We build it from a bottoms-up perspective. And I would just say that what we reported was actuals and what we're guiding to is guidance, right? So it's not comparing apples to apples.

34.    Notably, Defendant Robins was questioned as to the increase in operating expenses in relation to the forecasted guidance.

<Q: Michael Joseph Cikos – Needham & Company – Analyst > Brian, I think first question for you. Just with the guidance, a bit of a 2-parter here, but I know you're talking about how there's less conservatism in the guide now. ***And I just want to***

*make sure I'm clear. Is that -- the first part, is that for both revenue and OpEx as far as the implied cost structure there? Or is it more just for the revenue?*

And then I guess the follow-on to that, I know the company has like really beat the drum as far as profitable scale. *And so even if I x out the $15 million of summit, and I'm not going to back out JiHu just because it seems like a recurring cost until you, I guess, take it out as a consolidated statement, but there's still a massive uptick in the implied OpEx when I think about your guidance. And that's really what I'm trying to square on my side.*

<A: Brian G. Robins> Yes. Thanks. You're correct. We have been very consistent since the IPO road show is our #1 objective is to grow, but we'll do that responsibly. The less conservative, we have beat the profitability pretty handedly every quarter, and so it's more directed at the top line than the bottom line. But we still want -- the #1 thing at the company is still to grow, and we'll do that responsibly. And so you can expect that from us.

(Emphasis added.)

35.     A number of well-known analysts following Gitlab commented on the Company's disclosures. For example, Needham analyst reported that GitLab was "quick to call out that new offerings are captured in the guidance, but Revenue contribution will be slow to ramp due to GitLab's ratable Subscription-based model." Another analyst, Scotiabank reported "[w]e think the main debate now turns to how much of the strength in 4Q was driven by the premium pricing change vs. better execution/improving macro conditions. Mgmt did not give any additional granularity on 4Q impacts from the pricing change, but reiterated their expected $10M-$20M tailwind in FY25 from the Premium changes."

36.     Investors and analysts reacted immediately to GitLab's revelation. The price of GitLab's common stock declined dramatically. From a closing market price of $74.47 per share on March 4, 2024, GitLab's stock price fell to $58.84 per share on March 5, 2024, a decline of about 21% in the span of just a single day.

37.     The fact that these analysts, and others, discussed GitLab's shortfall and below-expectation revenue, as well as the Company's shockingly conservative guidance suggests the public placed significant weight on GitLab's statements of prior confidence in their new growth

plan. The frequent, in-depth discussion of GitLab's guidance confirms that Defendants' statements during the Class Period were material.

***Loss Causation and Economic Loss***

38.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of GitLab's common stock and operated as a fraud or deceit on Class Period purchasers of GitLab's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of GitLab's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of GitLab's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

39.     GitLab's stock price fell in response to the corrective event on March 4, 2024, as alleged *supra*. On March 4, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning GitLab's forecasting processes and 2024 revenue growth guidance.

40.     In particular, on March 4, 2024, GitLab announced significantly below-market growth expectations of only 25-26% for fiscal year 2025. This projection was well below the market expectations generated by GitLab's own previous reports of economic growth and internal growth projections provided throughout fiscal year 2024.

***Presumption of Reliance; Fraud-On-The-Market***

41.     At all relevant times, the market for GitLab's common stock was an efficient market for the following reasons, among others:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

(a)     GitLab's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     GitLab communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     GitLab was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about GitLab was reflected in and incorporated into the Company's stock price during the Class Period.

42.     As a result of the foregoing, the market for GitLab's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in GitLab's stock price. Under these circumstances, all purchasers of GitLab's common stock during the Class Period suffered similar injury through their purchase of GitLab's securities at artificially inflated prices, and a presumption of reliance applies.

43.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah*

*v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

44.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

45.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

46.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of GitLab who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

1

**CLASS ACTION ALLEGATIONS**

2      47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

3   Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

4   otherwise acquired GitLab's securities during the Class Period (the "Class"); and were damaged

5   upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants

6   herein, the officers and directors of the Company, at all relevant times, members of their

7   immediate families and their legal representatives, heirs, successors or assigns and any entity in

8   which defendants have or had a controlling interest.

9      48.     The members of the Class are so numerous that joinder of all members is

10  impracticable. Throughout the Class Period, GitLab's securities were actively traded on the

11  NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can

12  be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

13  thousands of members in the proposed Class. Record owners and other members of the Class may

14  be identified from records maintained by GitLab or its transfer agent and may be notified of the

15  pendency of this action by mail, using the form of notice similar to that customarily used in

16  securities class actions. As of March 15, 2024 there was approximately 130.2 million shares of

17  the Company's Class A common stock outstanding. Upon information and belief, these shares

18  are held by thousands, if not millions, of individuals located throughout the country and possibly

19  the world. Joinder would be highly impracticable.

20     49.     Plaintiff's claims are typical of the claims of the members of the Class as all

21  members of the Class are similarly affected by Defendants' wrongful conduct in violation of

22  federal law that is complained of herein.

23     50.     Plaintiff will fairly and adequately protect the interests of the members of the Class

24  and has retained counsel competent and experienced in class and securities litigation. Plaintiff has

25  no interests antagonistic to or in conflict with those of the Class.

26

27

28

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of GitLab;

(c)     whether the Individual Defendants caused GitLab to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the prices of GitLab's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>COUNT I</u>

### *Against All Defendants for Violations of*

### *<u>Section 10(b) and Rule 10b-5 Promulgated Thereunder</u>*

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

55.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GitLab common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire GitLab's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

56.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GitLab's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

57.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of GitLab's internal affairs.

59.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GitLab's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of GitLab's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired GitLab's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

60.     During the Class Period, GitLab's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of GitLab's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of GitLab's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of GitLab's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

61.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*
### *for Violations of Section 20(a) of the Exchange Act*

63.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about GitLab's misstatements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by GitLab which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GitLab disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GitLab to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GitLab's common stock.

67.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause GitLab to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

68.     By reason of the above conduct, the Individual Defendants and/or GitLab are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: September 4, 2024                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Plaintiff*