**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff Dutch Smith*
*and Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARLIE DOLLY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> GITLAB INC., SYTSE SIJBRANDIJ, BRIAN G. ROBINS, and DAVID DESANTO, <br><br> Defendants. | Case No. 5:24-cv-06244-EKL <br><br> **OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> Date: July 16, 2025 <br> Time: 10:00 a.m. PT <br> Dept: Courtroom 7, 4th Floor <br> Judge: Honorable Eumi K. Lee |

**TABLE OF CONTENTS**

I.     INTRODUCTION .......................................................................................................... 1

II.    SUMMARY OF FACTS ............................................................................................. 2

    A.     GitLab Waged a Fight with GitHub for AI-Development Market Share .............. 2

    B.     GitLab's "Duo" Was Inferior to GitHub's "Copilot" Product............................. 3

    C.     Increasing Its Premium Tier Pricing by 53% Imperiled GitLab's Growth............. 5

    D.     GitLab's Stock Price Plummeted After Each Partial Revelation of the Fraud ....... 6

III.   RELEVANT LEGAL STANDARD.................................................................................. 7

IV.    ARGUMENT ............................................................................................................ 7

    A.     The Complaint Is Not a Puzzle Pleading ................................................................ 7

    B.     The Complaint Adequately Alleges Material Misrepresentations or Omissions.... 9

        1.     Defendants' Statements Concerning Premium Price-Driven Growth .......... 10

        2.     Defendants' Statements Concerning AI-Driven Growth.............................. 11

        3.     Defendants' Misstatements Are Not Shielded by the PSLRA...................... 13

        4.     Defendants' Misstatements Are Not Inactionable Opinions or Puffery ....... 15

    C.     The Complaint Adequately Alleges a Strong Inference of Scienter.................... 17

        1.     Access to Adverse Information Supports Strong Inference of Scienter ....... 17

        2.     Suspicious Timing of Departures Bolsters Scienter Inference ..................... 21

        3.     Defendants Offer No Plausible Competing Inference ................................. 21

    D.     The Complaint Adequately Alleges Loss Causation ........................................... 22

    E.     The Complaint Adequately Pleads "Control Person" Liability ........................... 25

    F.     Any Dismissal Without Leave to Amend and With Prejudice Is Unwarranted ... 25

V.     CONCLUSION........................................................................................................ 25

OPPOSITION TO MOTION TO DISMISS
CASE NO. 5:24-CV-06244-EKL

# **TABLE OF AUTHORITIES**

**Cases**

*In re Alphabet Inc. Sec. Litig.*,

    1 F.4th 687 (9th Cir. 2021) ........................................................................................ 17, 21

*In re Apple Sec. Litig.*,

    2020 WL 2857397 (N.D. Cal. June 2, 2020)......................................................... 11, 16

*In re Aqua Metals, Inc. Sec. Litig.*,

    2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ............................................................. 8

*In re Atossa Genetics Inc. Sec. Litig.*,

    868 F.3d 784 (9th Cir. 2017) ...................................................................................... 13

*Azar v. Yelp, Inc.*,

    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ........................................................... 11

*Backe v. Novatel Wireless, Inc.*,

    642 F.Supp.2d 1169 (S.D. Cal. 2009) ....................................................................... 12

*Berson v. Applied Signal Tech., Inc.*,

    527 F.3d 982 (9th Cir. 2008) ................................................................................... 9, 18

*In re BioMarin Pharm. Inc. Sec. Litig.*,

    2022 WL 164299 (N.D. Cal. Jan. 6, 2022)................................................... 15, 20, 21

*In re BioVie Inc. Sec. Litig.*,

    2025 WL 947667 (D. Nev. Mar. 27, 2025) ......................................................... 16, 18

*In re Bofi Holding, Inc. Sec. Litig.*,

    977 F.3d 781 (9th Cir. 2020) ...................................................................................... 22

*Bos. Ret. Sys. v. Uber Techs., Inc.*,

    2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .............................................................. 9

*Brendon v. Allegiant Travel Co.*,

    412 F.Supp.3d 1244 (D. Nev. 2019)........................................................................... 19

OPPOSITION TO MOTION TO DISMISS
CASE NO. 5:24-CV-06244-EKL

*Camp v. Qualcomm Inc.*,

   2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) ................................................................ 24

*Cheetany v. Bergstrom*,

   2022 WL 2541778 (D. Nev. June 21, 2022) ................................................................ 12

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,

   527 F.Supp.3d 1151 (N.D. Cal. 2021) ........................................................................ 19

*Costabile v. Natus Med. Inc.*,

   293 F.Supp.3d 994 (N.D. Cal. 2018) .......................................................................... 14

*Curry v. Yelp, Inc.*,

   2015 WL 7454137 (N.D. Cal. Nov. 24, 2015) ........................................................... 24

*In re CV Therapeutics, Inc.*,

   2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ............................................................. 14

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,

   81 F.4th 918 (9th Cir. 2023) ....................................................................................... 21

*Eminence Cap., LLC v. Aspeon, Inc.*,

   316 F.3d 1048 (9th Cir. 2003) .................................................................................... 25

*In re Extreme Networks, Inc. Sec. Litig.*,

   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ........................................................... 19

*Facciola v. Greenberg Traurig, LLP*,

   781 F.Supp.2d 913 (D. Ariz. 2011), *aff'd,* 593 F. App'x 723 (9th Cir. 2015) ............ 9

*Felipe v. Playstudios Inc.*,

   2024 WL 1380802 (D. Nev. Mar. 31, 2024) .............................................................. 23

*Flynn v. Sientra, Inc.*,

   2016 WL 3360676 (C.D. Cal. June 9, 2016) ............................................................... 8

*In re Genius Brands Int'l, Inc. Sec. Litig.*,

   97 F.4th 1171 (9th Cir. 2024) ............................................................................... 22, 23

OPPOSITION TO MOTION TO DISMISS
CASE NO. 5:24-CV-06244-EKL

*In re Gilead Scis. Sec. Litig.*,

    536 F.3d 1049 (9th Cir. 2008) ................................................................................................ 7

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,

    63 F.4th 747 (9th Cir. 2023) ................................................................................ 12, 15, 16, 20

*Grigsby v. BofI Holding, Inc.*,

    979 F.3d 1198 (9th Cir. 2020) .............................................................................................. 24

*Hammer v. Frontier Fin. Corp.*,

    2011 WL 13229260 (W.D. Wash. Sept. 7, 2011) .................................................................. 17

*Hatamian v. Adv. Micro Devices, Inc.*,

    87 F.Supp.3d 1149 (N.D. Cal. 2015) ..................................................................................... 16

*Homyk v. ChemoCentryx, Inc.*,

    2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ...................................................................... 20

*Hsing Ching Hsu v. Puma Biotechnology, Inc.*,

    2017 WL 3205774 (C.D. Cal. July 25, 2017)....................................................................... 14

*In re Impinj, Inc. Sec. Litig.*,

    414 F.Supp.3d 1327 (W.D. Wash. 2019) ............................................................................. 23

*In re Intuitive Surgical Sec. Litig.*,

    65 F.Supp.3d 821 (N.D. Cal. 2014)........................................................................................ 8

*Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*,

    No. 18-CV-07669-HSG, 2020 WL 1244936 (N.D. Cal. Mar. 16, 2020)................................ 24

*In re JDS Uniphase Corp. Sec. Litig.*,

    2005 WL 43463 (N.D. Cal. Jan. 6, 2005).............................................................................. 13

*Kampe v. Volta Inc.*,

    2024 WL 4534732 (N.D. Cal. Oct. 21, 2024) ........................................................................ 8

*Khoja v. Orexigen Therapeutics, Inc.*,

    899 F.3d 988 (9th Cir. 2018) ................................................................................ 7, 8, 15, 25

*Leventhal v. Chegg, Inc.*,

   721 F.Supp.3d 1003 (N.D. Cal. 2024)........................................................................... 23

*Lloyd v. CVB Financial Corp.*,

   811 F.3d 1200 (9th Cir. 2016) ..................................................................................... 24

*Loos v. Immersion Corp.*,

   762 F.3d 880 (9th Cir. 2014) ....................................................................................... 24

*Lu v. Align Tech., Inc.*,

   417 F.Supp.3d 1266 (N.D. Cal. 2019).......................................................................... 9

*Luo v. Spectrum Pharms., Inc.*,

   2024 WL 4443323 (D. Nev. Oct. 7, 2024) ................................................................. 16

*Matrixx Initiatives, Inc. v. Siracusano*,

   563 U.S. 27 (2011) .................................................................................................. 7, 20

*In re McKesson HBOC, Inc. Sec. Litig.*,

   126 F.Supp.2d 1248 (N.D. Cal. 2000).......................................................................... 19

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,

   540 F.3d 1049 (9th Cir. 2008) ...................................................................................... 8

*In re MGM Mirage Sec. Litig.*,

   2013 WL 5435832 (D. Nev. Sept. 26, 2013)............................................................... 13

*Miller v. Thane Int'l, Inc.*,

   519 F.3d 879 (9th Cir. 2008) ...................................................................................... 10

*Mineworkers' Pension Scheme v. First Solar Inc.*,

   881 F.3d 750 (9th Cir. 2018) ................................................................................. 22, 23

*Mulderrig v. Amyris*,

   492 F.Supp.3d 999 (N.D. Cal. 2020)............................................................................ 14

*N.Y. Hotel Trades Cncl. & Hotel Ass'n of NYC, Inc. Pension Fund v. Impax Lab'ys, Inc.*,

   843 F.App'x 27 (9th Cir. 2021)..................................................................................... 24

*N.Y. Hotel Trades Cncl. & Hotel Ass'n of NYC, Inc. Pension Fund v. Impax Lab'ys, Inc.*,
2020 WL 957066 (9th Cir. Feb. 14, 2020) ................................................................. 24

*No. 84 Employer–Teamster Joint Cncl. Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir.2003) ................................................................. 13, 22

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ................................................................. 24

*In re New Century*,
588 F.Supp.2d 1206 (C.D. Cal. 2008) ................................................................. 9

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ................................................................. 17

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) ................................................................. 25

*In re Nuvelo, Inc. Sec. Litig.*,
668 F.Supp.2d 1217 (N.D. Cal. 2009) ................................................................. 14

*Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.*,
2024 WL 5182634, (9th Cir. Dec. 20, 2024) ................................................................. 12

*Omnicare, Inc. v. Laborers Dist. Cncl. Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ................................................................. 15, 16

*Osher v. JNI Corp.*,
183 Fed. Appx. 604 (9th Cir. 2006) ................................................................. 25

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ................................................................. 21

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ................................................................. 12

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ................................................................. passim

OPPOSITION TO MOTION TO DISMISS
CASE NO. 5:24-CV-06244-EKL

*In re QuantumScape Sec. Class Action Litig.*,

　　580 F.Supp.3d 714 (N.D. Cal. 2022)................................................................................. 15

*Rabkin v. Lion Biotechnologies, Inc.*,

　　2018 WL 905862 (N.D. Cal. Feb. 15, 2018).................................................................... 24

*Reese v. Malone*,

　　747 F.3d 557 (9th Cir. 2014) ...................................................................................... 20, 21

*Rihn v. Acadia Pharm., Inc.*,

　　2016 U.S. Dist. LEXIS 128291 (S.D. Cal. Sept. 19, 2016)............................................... 8

*Robb v. Fitbit Inc*,

　　2017 WL 219673 (N.D. Cal. Jan. 19, 2017)..................................................................... 19

*Roberts v. Zuora, Inc.*,

　　2020 WL 2042244 (N.D. Cal. Apr. 28, 2020)................................................................... 18

*Rok v. Identiv, Inc.*,

　　2017 WL 35496 (N.D. Cal. Jan. 4, 2017)......................................................................... 24

*S. Ferry LP, No. 2 v. Killinger*,

　　542 F.3d 776 (9th Cir. 2008) ............................................................................................ 21

*Scheller v. Nutanix, Inc.*,

　　2020 WL 5500422 (N.D. Cal. Sept. 11, 2020).................................................................. 19

*Schueneman v. Arena Pharms., Inc.*,

　　840 F.3d 698 (9th Cir. 2016) ...................................................................................... 10, 11

*Shenwick v. Twitter, Inc.*,

　　282 F.Supp.3d 1115 (N.D. Cal. 2017)............................................................................ 11, 20

*Shnayder v. Allbirds, Inc.*,

　　2024 WL 2125598 (N.D. Cal. May 10, 2024)..................................................................... 8

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,

　　160 F.Supp.2d 1059 (N.D. Cal. 2001)................................................................................ 8

OPPOSITION TO MOTION TO DISMISS
CASE NO. 5:24-CV-06244-EKL

*In re Splunk Inc. Sec. Litig.*,
   592 F.Supp.3d 919 (N.D. Cal. 2022)........................................................................................ 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................................................ 17, 22

*Thant v. Rain Oncology Inc.*,
   2025 WL 588994 (N.D. Cal. Feb. 24, 2025)............................................................................ 24

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .......................................................................... 11

*Turocy v. El Pollo Loco Holdings, Inc.*,
   2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ........................................................................... 17

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
   2024 WL 5153343 (D. Ariz. Dec. 16, 2024)............................................................................... 9

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F.Supp.2d 964 (N.D. Cal. 2009)........................................................................................ 21

*In re WageWorks, Inc., Sec. Litig.*,
   2020 WL 2896547 (N.D. Cal. June 1, 2020)............................................................................ 21

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ..................................................................................................... 12

*Waterford Twp. Police v. Mattel, Inc.*,
   321 F.Supp.3d 1133 (C.D. Cal. 2018) ...................................................................................... 25

*Wenger v. Lumisys, Inc.*,
   2 F.Supp.2d 1231 (N.D. Cal. 1998);.......................................................................................... 8

*Weston v. DocuSign, Inc.*,
   669 F.Supp.3d 849 (N.D. Cal. 2023).................................................................................. 14, 15

*Yanek v. Staar Surgical Co.*,
   388 F.Supp.2d 1110 (C.D. Cal. 2005) ...................................................................................... 12

OPPOSITION TO MOTION TO DISMISS
                                                         CASE NO. 5:24-CV-06244-EKL

*Zelman v. JDS Uniphase Corp.*,

  376 F.Supp.2d 956 (N.D. Cal. 2005) ...................................................................................... 18

*Zhou v. Faraday Future Intell. Elec. Inc.*,

  2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) ........................................................................ 21

*Zhu v. Taronis Techs. Inc.*,

  2020 WL 1703680 (D. Ariz. 2020) ........................................................................................ 24

**Statutes**

15 U.S.C. § 78u-4(b)(2) ............................................................................................................. 17

## I.     **INTRODUCTION**

Defendants claimed that GitLab's software development platform provided subscribers with unparalleled AI capabilities. Plaintiff's case takes aim at Defendants' statements about the true value of these AI capabilities and GitLab's efforts to distinguish itself from its main competitor, GitHub. In June 2022, GitHub (not to be confused with GitLab) was first to offer AI-powered software developer tools to the market through its "Copilot" program. Defendants scrambled to catch-up and the following year, in June 2023, they announced GitLab's own suite of AI features known as "GitLab Duo" or "Duo." From this point forward, Defendants' public statements about the demand for Duo and GitLab's opportunity to benefit from AI integration were materially false and misleading. As described by multiple corroborating confidential witnesses and former employees, Defendants knew internally that GitLab's platform-wide AI integration was not seen as a value add due to data privacy and security concerns. Its full suite of AI capabilities was dramatically exaggerated. In truth, Duo could not (and, in fact, was never intended to) compete with Copilot because its AI features had limited functionality for a significant portion of GitLab's customer base. Moreover, GitLab's AI suite was largely available to only cloud subscribers, which excluded many of its target customers due to the security implications associated with web access.

GitLab's market inferiority was only exacerbated by its decision to raise the price of its primary subscription plan by 53% in April 2023. While Defendants claimed the price increase matched the value of its new features offered and customer response supported sustained growth benefits, the change proved detrimental to GitLab's earnings. In March 2024, GitLab revealed revenue growth targets significantly below market expectations and told investors it needed more time to "build its pipeline and close deals on new products." Then, in June 2024, GitLab disclosed a further reduction to its prior fiscal guidance, disappointing quarterly earnings and declining retention rates, solidifying a fundamental shift in customer buying behavior. One month later, GitLab rolled back the price increase for roughly 30% of its customer base and began offering a free 60-day trial of Duo to new and existing customers. For analysts and investors alike, it became apparent that Defendants' statements about GitLab's growth from AI-driven demand and customer adoption of the price increase had been materially false and misleading. Public investors suffered

significant losses as the price of GitLab's stock declined from highs of more than $75 per share to $45 per share with each revelation. Plaintiff brings this action to recover these losses.

## II.     SUMMARY OF FACTS

### A.     GitLab Waged a Fight with GitHub for AI-Development Market Share

On June 21, 2022, GitLab's chief competitor, GitHub, was first to offer AI-powered features through its "Copilot" product capable of assisting developers by, *inter alia*, offering code suggestions and generating solution code. ¶¶68-69, 115. GitHub offered Copilot for $10 per user/month or $100/year. ¶68. Under pressure to remain competitive, GitLab scrambled to formulate an effective AI strategy, with one former employee describing the general sentiment at this time as panic. ¶111. In September 2022, GitLab revealed its own AI-powered initiatives with "new advancements in GitLab 15"—the latest iteration of its platform—that included the integration of AI across the entire software development lifecycle. ¶¶70-71.

In March 2023, Defendants again focused attentions on GitLab's "product priorities" including expanding "new use cases and audiences with [AI]" by "pursuing AI as a fundamental and integrated part of the DevSecOps platform … creating AI-assisted capabilities for everyone in the software delivery workflow [for] improved productivity and efficiency." ¶72. They went on to highlight GitLab's AI innovations including its own version of "code suggestions" purportedly launched in February and claimed their "pace of innovation [wa]s widening the competitive moat." *Id.* When specifically asked about GitHub, Sijbrandij called out similarities but also sought differentiate: "our strategy for AI is more than just code suggestions" so "[w]e have the code suggestions right now in closed beta, but we're working on many more AI-powered features." ¶73.

In May 2023, GitLab hosted an AI Fireside Chat to showcase its advancements in AI-powered features for the entire software development lifecycle, designed to ease concerns that it had fallen too far behind GitHub. ¶¶74-83. Defendants discussed "GitLab's differentiators" described as AI-powered features designed to "help security and operations personas" and its "focus[] on a privacy-first approach." ¶¶75-76. When asked to directly compare GitLab's AI advancements with GitHub Copilot, Sijbrandij replied "GitHub is very focused on everything that

has to do with development and coding. And we have to do that [too] but we also want to do security … operations … planning and value stream management across the entire life cycle." ¶77.

Analysts and investors alike came away from the AI Fireside Chat focused on GitLab's ability to increase its market reach by integrating AI throughout the entire DevSecOps process. ¶¶82-83. Indeed, RBC Capital Markets noted, "[w]hile no financial details were given, [the market] came away with a better appreciation of the role of GenAI across the SDLC [software development lifecycle] and GitLab's opportunity to benefit from fast moving trends." ¶82.

**B.     GitLab's "Duo" Was Inferior to GitHub's "Copilot" Product**

On June 5, 2023, the first day of the Class Period, GitLab announced the much-anticipated financial details for its paid add-on of AI features, GitLab Duo, to be priced at $9 per user/month when made available later that year across all subscription tiers. ¶¶97, 148. At the same time, GitLab reported stronger-than-expected 1Q24 financial results, touting its AI innovations and strong demand for platform-wide integration as a driving force of its current and future growth. ¶¶97-98, 144-46, 148, 152-53. On these announcements, one analyst covering GitLab declared "continued confidence in [its] ability to execute on GenAI opportunity" highlighting how it "has quickly shifted to embedding more capabilities into [its] platform" and another analyst raised its price target to $45 from $30 "on higher estimates as GitLab benefits from [ ] AI tailwinds" noting "GitLab has released ten AI features this year which remain in the early phase of adoption and management emphasized demand from customers for an entire DecSecOps platform." ¶¶100-01.

Throughout the Class Period, GitLab continued to report stronger-than-expected financial results, attributing quarterly revenue growth to its "rapid pace of product innovation and strong customer demand" for AI features throughout the entire DevSecOps platform, and claimed these results "demonstrate continued momentum and solidify our category leadership." ¶¶103, 160-61; *see also* ¶¶192-93. Further, based on the strong financial results in FY2024 and on repeated reports of "customer validation" of its AI strategy, Defendants reiterated the strength of GitLab's pipeline through FY2025 with the expanded monetization opportunities from GitLab Duo. ¶¶103, 105-06.

Defendants' public assurances of AI-driven demand supporting current and future revenue growth are directly contradicted by material adverse information known by them from the outset

of the Class Period that only worsened throughout. ¶¶217-37. First, a former Director of Security Engineering and an original member of the security team assisting in the building of GitLab's AI product offering (FE4), explained that it was generally understood internally from the outset of developing the Company's AI strategy that GitLab was not capable of designing AI features that could directly compete with Copilot. ¶¶36-38, 112. As explained by FE4 and corroborated by GitLab's channel partner (CW1), GitLab prioritized designing AI features for companies operating in high security sectors that need strong audit trails, focusing on workflows when it comes to software development as opposed to enhancing individual productivity. ¶¶39, 112-13. While this type of approach may increase the speed of deployment, it does not translate to the best product for the end user, CW1 said. ¶113. The co-founder of a software engineering company (CW2) confirmed the disparity between the two products, describing the poor quality of Duo's response times and the actual responses themselves, even on the enterprise level, when compared to Copilot. ¶¶40, 116. Accordingly, despite public assertions to the contrary, GitLab internally never intended to offer developer tools (like code suggestions) to be competitive with GitHub's Copilot. ¶112. Second, a former Customer Success Strategy Manager (FE2), tasked with helping enterprise customers (which comprised 60% of GitLab's annual recurring revenue (ARR), ¶57) with platform adoption and add-on opportunities, recounted that, as of July 2023, GitLab's AI features had yet to be released to its customers. ¶¶32-33, 109-10. Next, a former Head of Global Cloud Partnerships Sales and Director of Strategic Partnerships (FE1), working with GitLab's partners on the resale of its platform, reported that GitLab executive, Ashley Kramer, often exaggerated its AI capabilities which led to consistent conflict amongst her and other senior executives, including Sijbrandij and Robins. ¶¶28-31, 50, 118. Likewise, FE1 recounted that at no point did GitLab's AI capabilities match those that had been publicly touted. ¶117. Consequently, FE1 recalled that customer feedback regarding GitLab's AI features was largely negative for a long time. *Id.*

The negative market response to Duo was the result of systemic problems that predated the Class Period. CW1 explained that because GitLab's full suite of AI features is only accessible for SaaS subscribers in a cloud environment or in limited form for any subscriber connected to the internet, this made it a hard selling point for those operating in high security sectors, often on self-

4

managed subscriptions disconnected from the internet for security reasons. ¶114. According to CW1, the inability to use GitLab's AI features without a platform subscription further hindered its monetization plan for Duo when compared to GitHub's Copilot, which was available as a plug-in on any platform and divisible from security. ¶115. Moreover, according to FE1, AI integration throughout the software development lifecycle was rarely a feature that customers were excited about and recalled how hard it was to sell GitLab's AI features. ¶117. These accounts are confirmed by GitLab's April 2024 survey (released post-Class Period), which revealed that of the executives surveyed only 26% reported implementing AI into their software development process last year with the majority referring to AI integration as risky and cited concerns about privacy and data security as a top obstacle to using AI. ¶¶134-35. The weak demand for GitLab's AI features became further apparent when, in July 2024, GitLab began offering free 60-day trials for new and existing customers. ¶¶136-38.

**C.      Increasing Its Premium Tier Pricing by 53% Imperiled GitLab's Growth**

Separate and apart from its inferior AI capabilities, GitLab's products were expensive relative to its competitors. On March 2, 2023, just prior to the release of GitLab 16, its newest platform iteration incorporating its full AI suite, GitLab announced a 53% increase for its Premium tier pricing, from $19 to $29 per user/month. ¶¶84, 86-87. Defendants attributed the steep incline to GitLab's "compelling value and having the most comprehensive platform" with the inclusion of "more than 400 features across the entire software development lifecycle" since its last price change, including certain AI-powered features. ¶¶72, 87, 89, 91. At the same time, they announced user limits for GitLab's Free tier claiming, "this change will drive an even greater adoption of [its] paid tiers." ¶88. Based on GitLab's revenue recognition model and average contract terms, the market understood that the Premium price increase was to have a layered impact with some benefit in FY2024, the greatest growth to come in FY2025, and some tailwind in FY2026. ¶¶90, 92-96.

Throughout the Class Period, Defendants assured investors that the Premium price increase "better aligns price with value" for all GitLab customers and made repeated representations that "customer behavior was in line with [ ] expectations" for FY2024, touting renewals and churn rates and reporting "sales cycles have normalized across the board," supporting their consistent

reiteration that "the majority of the impact would come in FY 2025." ¶¶99, 104-06. Defendants' public assurances that the customer response was "going as planned" ensuring greater growth in FY2025 are directly contradicted by material adverse information known by them from the outset of the Class Period that only worsened throughout. *See* ¶¶51-62, 112-17, 220-31, 234, 238-39.

To evaluate the strength of GitLab's business, identify trends, and formulate business plans, Defendants monitor several key metrics relating to customer buying behavior including: (i) average sales cycles; (ii) monthly recurring revenue (MRR); (iii) ARR (calculated by multiplying MRR by 12); and (iv) dollar-based net retention rates (DBNRR) which starts with calculating the ARR for customers during the prior 12-month period and these same customers' current period ARR, including any subscription upsells, price adjustments, user growth within a customer (*i.e.*, seat expansion), contraction, and attrition, followed by dividing the Current Period ARR by the Prior Period ARR. ¶¶51-62. Each period after the price change took effect, key internal metrics showed declining expansion rates, especially in its SMB and mid-market, negatively impacting growth in FY2024 and negating any potential outsized impact in FY2025. ¶¶60, 132, 140-41. As corroborated by FE1, FE4, CW1 and CW2, GitLab's AI integration throughout the software development lifecycle, serving as some justification for the change, was not seen as a value add for its customers, especially those with data privacy and security concerns, and its AI features were not a competitive offering to Copilot. ¶¶112-14, 116-17. As explained by FE4 and CW1, GitLab tailored its AI features specifically for its enterprise and public sectors, further reducing any value added for its SMB and mid-market. ¶¶112-13. Post-Class Period events confirm Defendants' fraudulent misconduct when, on July 1, GitLab partially rolled back the price increase offering a "SMB Premium Tier" for $19 per user/month. ¶¶136, 138. And in September, when asked about the impact of the change, Robins admitted "price sensitivity [] in SMB and mid-market." ¶139.

**D.    GitLab's Stock Price Plummeted After Each Partial Revelation of the Fraud**

On March 4, 2024, GitLab announced strong 4Q24 results followed by the lower-than-expected guidance for FY2025 while also announcing a $10 increase ($9 to $19 per user/month) for Duo. ¶¶120-21. The provided reasons for the lowered guidance included "seeing normalization in buying behavior" and needing time to "build its pipeline and close deals on new products." ¶122.

On this news, GitLab's stock price fell 21% in one day. ¶124. Despite this precipitous decline, the stock price remained inflated due to Defendants' continued concealment of negative demand trends. ¶¶125-28. Then, on June 3, 2024, GitLab announced its 1Q25 results including a sequential decline in DBNRR and a disappointing 21% y/y increase in ARR, missing expectations by 5 points and representing a 16 point drop from 4Q24. ¶129. It also announced the completed stand-alone selling price (SSP) analysis which resulted in an additional $4 million headwind to the previously disclosed fiscal guidance. ¶¶123, 129. On this news, GitLab's stock price fell 5% in one day. ¶130.

### III.    RELEVANT LEGAL STANDARD

To state a Section 10(b) claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). "Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). On a Rule 12(b)(6) motion, courts must "'take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party.'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). Importantly, "a district court ruling on a motion to dismiss is not sitting as a trier of fact … A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Defendants here challenge falsity, scienter, and loss causation. Each of their arguments fail.

### IV.    ARGUMENT

#### A.    The Complaint Is Not a Puzzle Pleading

"In the securities fraud context, the term 'puzzle pleading' refers to a pleading that requires a defendant and the court to 'match up' the statements that form the basis of the plaintiff's claims with the reasons why those statements are misleading." *Park v. GoPro, Inc.*, 2019 WL 1231175, at *8 (N.D. Cal. Mar. 15, 2019). The Complaint here is carefully organized with a designated section entitled "Defendants' Materially False and Misleading Statements," identifying each

alleged misstatement, who made it, when and where, and directly after each alleged misstatement, explains why that statement was false or misleading when made. ¶¶142-215. Where large block quotations are necessary, Plaintiff emphasizes the portion(s) of the statement alleged to be false or misleading. *See id*. Courts routinely find this style of pleading permissible. *In re Intuitive Surgical Sec. Litig.*, 65 F.Supp.3d 821, 831 (N.D. Cal. 2014) (not a "puzzle pleading" where plaintiff "detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading"); *Kampe v. Volta Inc.,* 2024 WL 4534732, at *6 (N.D. Cal. Oct. 21, 2024) (finding complaint "is generally organized in a manner that permits the reader to connect the allegedly false or misleading statements with the reasons why Plaintiff challenges those statements"); *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *9-10 (C.D. Cal. June 9, 2016) (sufficient pleading where plaintiffs "highlight in bold and italics the particular statements in [SEC] filings that they shortly thereafter contend to be false or misleading"). By alleging the "'who, what, when, where, and how' of the fraud," Plaintiff also meets the heightened pleading standards of Rule 9(b) and the PSLRA. *Khoja*, 899 F.3d at 1008.[1]

Contrary to Defendants' assertions, block quotations do not make a puzzle pleading when they are on notice of "the true substance of the claims against them." *Intuitive Surgical*, 65 F.Supp.3d at 831; *see also Rihn v. Acadia Pharm., Inc.*, 2016 U.S. Dist. LEXIS 128291, at *15 n.1 (S.D. Cal. Sept. 19, 2016) ("Although the [complaint] includes multiple block quotes, it is clear from the italicized portions of the quotes and the other allegations of the complaint what statements Plaintiff alleges are misleading and why"); *cf. Shnayder v. Allbirds, Inc.*, 2024 WL 2125598, at *1 (N.D. Cal. May 10, 2024) (puzzle pleading where plaintiffs assert complaint "does not allege [emphasized statements are] misleading"); *Lu v. Align Tech., Inc.*, 417 F.Supp.3d 1266, 1275 (N.D.

---

[1] The structure here is distinct from Defendants' cases, where the alleged misstatements were not separated or emphasized nor accompanied by reasons why they were false or misleading. *See* Defs. Br. at 8-10 (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1070 (9th Cir. 2008); *Wenger v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1243 (N.D. Cal. 1998); *In re Aqua Metals, Inc. Sec. Litig.,* 2019 WL 3817849, at *7 (N.D. Cal. Aug. 14, 2019); *In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1074-75 (N.D. Cal. 2001).

Cal. 2019) (same).[2] Likewise, "a long and detailed complaint is not a work of 'puzzle pleading' as a matter of law." *In re New Century*, 588 F.Supp.2d 1206, 1219 (C.D. Cal. 2008) (denying dismissal of a 375-page complaint); *see*, *e.g.*, *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 2024 WL 5153343, at *4 (D. Ariz. Dec. 16, 2024). Lastly, their grief with similarity among provided reasons why rings hollow as the same evidence is probative of falsity, and repetition does not make a puzzle pleading. *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *5 (N.D. Cal. Aug. 7, 2020) ("While the complaint might be 'repetitive' … it is not so deficient as to amount to puzzle pleading."); *Park*, 2019 WL 1231175, at *8 (sufficient pleading where plaintiffs "set forth the reasons why they believe each statement is false or misleading, even if it is repetitive"). The Complaint "is neither rambling nor confusing," nor is it "so unruly that it is difficult for [ ] Defendants to determine which allegations support which claims." *Facciola v. Greenberg Traurig, LLP*, 781 F.Supp.2d 913, 921 (D. Ariz. 2011), *aff'd*, 593 F. App'x 723 (9th Cir. 2015).

**B.    The Complaint Adequately Alleges Material Misrepresentations or Omissions**

Under the federal securities laws it is "unlawful … [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Quality Sys.*, 865 F.3d at 1140. A statement is misleading if it "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "[T]he disclosure required by the securities laws is not measured by literal truth, but by the ability of the material to accurately inform rather than

_____

[2] Defendants' attempt to conjure confusion by arguing the Complaint does not emphasize all misstatements is inapt. Defs. Br. at 8, n.3. *First*, the identified paragraphs without emphasis are not "mass block quotes," but rather, provide the questions eliciting the alleged false or misleading answers. *See* ¶¶176, 178, 210. *Second*, they resist the obvious conclusion that statements with no emphasis are alleged to be false or misleading in their entirety. Equally unavailing is their claim that "plaintiff does not allege that some of the bold, italicized statements are false in any way." Defs. Br. at 8, n.3. From the only "example" given, emphasis is added to, "[t]his quarter, we had many conversations with senior-level customers…" followed by emphasis on, *inter alia*: "We are hearing from customers that AI is motivating them to assess how they develop, secure and operate software through a new lens." ¶148. Plaintiff alleges these statements are misleading because touting "positive interactions with customers about encompassing AI in every phase of the software development lifecycle, [created] a duty to disclose" a related, systemic issue creating negative market demand for the product. ¶149.

9

mislead prospective buyers." *Miller v. Thane Int'l, Inc*., 519 F.3d 879, 886 (9th Cir. 2008). "[O]nce defendants chose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc*., 840 F.3d 698, 706 (9th Cir. 2016).

One year after the general release of GitHub Copilot, GitLab positioned itself as a market leader in the race to integrate AI throughout the entire software development lifecycle offering a suite of AI features with a value capable of expanding its market reach and supporting its significant price increase. Defendants' misstatements fall into two categories: (1) Premium Price-Driven Growth statements and (2) AI-Driven Growth statements.

**1.     Defendants' Statements Concerning Premium Price-Driven Growth**

Throughout the Class Period, Defendants repeatedly told investors that the Premium price increase, effective April 3, 2023, was "part of [GitLab's] responsible growth strategy" as it "better aligns price with value" based on new features added, and offered assurances that past and current customer purchasing behavior had been "in line with [] expectations" or "better than expected" promoting specific metrics like new bookings, contraction and churn rates, while reiterating that "due to the ratable nature of [its] revenue and renewals … there would be very little impact in FY 2024 and the majority of the impact would come in FY 2025 with all the impact realized in the year of FY 2026." *See* ¶¶150, 155, 157, 163-64, 166, 170, 174, 176, 180, 184, 186, 197, 199, 201, 205, 210. Such statements were materially false and misleading because they concealed adverse internal information concerning GitLab's primary growth driver, net seat expansion, which was on a sequential decline in FY2024 due to price sensitivity in its Premium tier, especially amongst SMB and mid-market customers, negatively impacting current growth rates and significantly undermining the layered impact this change would have in FY2025. *See* ¶¶151, 156, 158, 165, 167, 171, 175, 181, 185, 187, 198, 200, 202, 206, 211; *see also* ¶¶132, 136, 138-140, Section II.C, *supra*.

Once Defendants chose to tout a positive customer response after the change, providing specific revenue metrics, they had a duty to "disclos[e] adverse information that cuts against the positive information," *i.e.*, declining expansion rates which were already having an adverse impact on growth in FY2024 and would likely significantly and negatively impact growth in FY2025.

*Schueneman*, 840 F.3d at 708 (statement that "Arena 'ha[d] favorable results on everything that we've compiled so far[]'" misleading when some internal data was negative); *see also Shenwick v. Twitter, Inc.*, 282 F.Supp.3d 1115, 1135-40 (N.D. Cal. 2017) (defendants "misled investors by failing to disclose [key internal] metrics" showing "flat or declining [] trends," which "cut[] against" their "reassurances [of] positive growth and [] trends"); *In re Apple Sec. Litig.*, 2020 WL 2857397, at *10-*11 (N.D. Cal. June 2, 2020) (when defendants touted "specific factors—such as high upgrade rates" it "require[d] disclosure" of adverse information relating factors); *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *13 (N.D. Cal. Nov. 27, 2018) (misleading when defendants "chose to tout Yelp's local advertising model as 'fairly proven'" while "omitting any mention of the churn issues that would likely significantly and negatively impact revenue"); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *6 (C.D. Cal. Apr. 12, 2016) (holding "allegations that the reality facing STAAR was bleaker than the picture the Company painted for its investors are sufficient").

### 2.    Defendants' Statements Concerning AI-Driven Growth

Throughout the Class Period, Defendants represented that GitLab's "strong quarter" financial results in FY2024 were "driven by the continued adoption of [its] DevSecOps Platform" as "the only DevSecOps company that integrates security, compliance, and AI into one platform" with at least "10 features out already" and "available to customers now," claiming these results "demonstrate continued momentum and solidify [its] category leadership" and support a strong FY2025 pipeline based on its ability to "expand[] the addressable market" with monetization of its AI suite "that enables customers to boost speed and efficiency without sacrificing privacy, security and compliance," declaring that "[o]ur approach to AI is resonating with our customers," pointing to specific interactions claiming "early feedback to Duo has been very positive. Customers get that they need AI features, not just for example, coding, but they need them throughout the DevOps life." *See* ¶¶144-46, 148, 152-53, 160-61, 163-64, 168, 170, 172, 174, 176, 178, 180, 182, 188, 191-93, 195, 199, 203, 208, 212, 214. Such statements were "inconsistent with," *Quality Sys.*, 865 F.3d at 1144, known and concealed internal information, as detailed by multiple, corroborating witnesses, including that: GitLab's AI features were not made available to customers until at least the second half of FY2024; GitLab received largely negative customer feedback about

AI integration throughout the software development lifecycle due to data privacy and security concerns, especially in its enterprise and public sectors (representing 70% of its total ARR); its AI capabilities were significantly overstated—its developer tools were not intended to, nor did they, compete with Copilot on increasing efficiency and its operations and security focused features were not seen as a value add—making GitLab's AI suite "hard to sell to customers" in all groups; and Duo's limited cloud or web access "is a really hard selling point" for the majority of GitLab's customer base. *See* ¶¶147, 149, 154, 162, 165, 169, 171, 173, 175, 177, 179, 181, 183, 189, 194, 196, 200, 204, 209, 213, 215; *see also* ¶¶57, 107-19, 134-35, 137, 217-19, Section II.B., *supra*.

Defendants' AI-Driven Growth statements "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023) (finding it misleading when defendants "'repeatedly reassured investors … that the number … of prospective sales in the pipeline was unchanged … and reassured them that the pipeline was full and growing'"); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Snap Inc.,* 2024 WL 5182634, at *2 (9th Cir. Dec. 20, 2024) (statement "[a]dvertisers that represent a majority of our … revenue have successfully implemented [new product tool]" misleading based on CW allegations that "there were very few adoptees" and that defendant "had barely begun working with its advertisers"); *Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) (statements about "'pretty significant demand' and that shipment levels would increase" actionable); *Warshaw v. Xoma Corp*., 74 F.3d 955, 959-60 (9th Cir. 1996) (finding assurance that "everything [was] going fine" misleading because it "contravened the unflattering facts in Xoma's possession"); *Cheetany v. Bergstrom*, 2022 WL 2541778, at *7 (D. Nev. June 21, 2022), *report and recommendation adopted*, 2022 WL 2539613, at *7 (D. Nev. July 6, 2022) (statements concerning "the target launch date" of "its main product" which defendants "knew were performing poorly . . . amount to 'everything is going fine,' when the product and companies were languishing, [thus] were materially misleading"); *Backe v. Novatel Wireless, Inc.*, 642 F.Supp.2d 1169, 1181 (S.D. Cal. 2009) (statements that defendant was experiencing "strong demand", that it was "continu[ing] to ramp to meet increasing demand in the marketplace" actionable); *Yanek v. Staar Surgical Co*., 388 F.Supp.2d 1110, 1130 (C.D. Cal. 2005)

OPPOSITION TO MOTION TO DISMISS
CASE NO. 5:24-cv-06244-EKL

(statements implying "*timely* commercialization" misleading where internal "facts suggest[ed] a possible delay in approval"); *In re JDS Uniphase Corp. Sec. Litig.*, 2005 WL 43463, at *1 (N.D. Cal. Jan. 6, 2005) ("falsely representing that demand for JDS products was strong" actionable).

### 3. **Defendants' Misstatements Are Not Shielded by the PSLRA**

Defendants contend that the "bulk" of their misstatements are protected forward-looking statements. Defs. Br. at 10-14.[3] But statements rooted in "current or past facts" are not forward-looking under the PSLRA. *Quality Sys.*, 865 F.3d at 1142; *see also In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 801 (9th Cir. 2017) (defendant's "emphasis on the past tense indicates that [he] was referring to prior events"); *No. 84 Employer-Teamster Joint Cncl. Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 937 (9th Cir.2003) (statements about the present effect of a past violation are not forward looking); *In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at *8 (D. Nev. Sept. 26, 2013) ("statements that a project is 'on-track,' … are not forward-looking but statements relating to *current* conditions"). Each challenged statement here refers to present or historical facts when discussing past events and/or current conditions. *See*, *e.g.*, ¶145 ("With AI revolutionizing how companies develop, secure, and operate software, we believe GitLab is positioned as the leading AI-powered DevSecOps platform[.] … Today, we deliver more AI-powered capabilities to customers than any other…."); ¶168 (similar); ¶150 ("As we mentioned on the prior call, we raised the price … We shared that we expected the Premium price increase to have minimum impact in FY '24 with greater impact in FY '25 and beyond. The price increase, … is going as planned. … To date, customer churn is unchanged … and our average ARR per customer increased in line with our expectations."); ¶186 (similar); ¶205 (similar); ¶160 ("'GitLab's strong quarter is a result of our focus on creating a differentiated and innovative DevSecOps platform and executing on a strong go-to-market motion[.] … We believe that our rapid pace of product innovation and strong customer demand position us to capture a greater share of the estimated $40 billion [TAM] opportunity.'"); ¶146 (similar); ¶161 (similar); ¶172 (similar);

---

[3] Defendants only cite to misstatements in ¶¶145, 146, 150, 160, 161, 168, 172, 186, 195, 205, and 208. Defs. Br. at 10-11. They do not challenge those in ¶¶144, 148, 152-53, 155, 157, 163-64, 166, 170, 174, 176, 178, 180, 182, 184, 188, 191-93, 195, 197, 199, 201, 203, 210, 212, or 214. And, therefore, waive any argument thereto. *See Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010).

¶195 (similar); ¶208 (similar). These statements are inherently "mixed" statements ineligible for protection. *Quality Sys.*, 865 F.3d at 1148 (revenue projections premised on current state of sales pipeline not protected); *Mulderrig v. Amyris*, 492 F.Supp.3d 999, 1021 (N.D. Cal. 2020) ("financial forecasts intertwined … with … misstatements of current revenues and … revenue pipeline" not protected); *Costabile v. Natus Med. Inc.*, 293 F.Supp.3d 994, 1013 (N.D. Cal. 2018) ("the challenged statements included implicit representations that the stated 'expectation' was consistent with the" present facts so not protected); *In re CV Therapeutics, Inc.*, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) ("The fact that defendants used those inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations.").

Even so, the safe harbor does not apply if the identified forward-looking statement is not "accompanied by meaningful cautionary statements" or "was made 'with actual knowledge … that the statement was false or misleading.'" *Quality Sys.*, 865 F.3d at 1141. Defendants had actual knowledge of falsity such that they knew there was weak demand for platform-wide AI integration, GitLab's customers did not see its AI features as a value add nor were they considered competitive to Copilot, and feedback on its AI features had been largely negative. *See In re Nuvelo, Inc. Sec. Litig.*, 668 F.Supp.2d 1217, 1221, 1230 (N.D. Cal. 2009) (plaintiff "need not allege that defendants knew [ongoing project] would fail; [plaintiff] need merely allege that defendants misled investors by omitting to disclose a material *risk* that [it] would fail"). Defendants cannot "benefit from safe harbor by simply saying they 'anticipated' success when, in fact, they had a reasonable belief that defeat was just around the corner." *Hsing Ching Hsu v. Puma Biotechnology, Inc.*, 2017 WL 3205774, at *3 (C.D. Cal. July 25, 2017). Likewise, Defendants had actual knowledge of falsity such that they knew expansion rates were declining throughout the Class Period undermining outsized impact in FY2025. *See Weston v. DocuSign, Inc.*, 669 F.Supp.3d 849, 875-80 (N.D. Cal. 2023) (statements of "plans or objectives relating to DocuSign's products or services" actionable concluding allegations of "waning demand, as evidenced by customer usage and retention metrics that were accessible to the individual defendants, and alleged statements … that plausibly show they tracked that data … enough to plausibly allege that defendants had actual knowledge").

Defendants also failed to accompany these challenged statements with "meaningful" cautionary language. *Glazer*, 63 F.4th at 780 ("language is not 'meaningful' [when] it amounts to only a boilerplate listing of generic risks and does not mention the specific risk"). The language "must be 'precise,' and 'directly address[]'" the misrepresentation such that "'the risk of real deception drops to nil.'" *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *3 (N.D. Cal. Jan. 6, 2022). Cautionary language is also insufficient where, as here, it warns of risks as mere hypotheticals even though they have already materialized. *See Khoja*, 899 F.3d at 1016 (warning study results "'*may*'" be inconsistent with interim results insufficient when defendants "knew already that the 'new data' revealed exactly that"); *Weston*, 699 F.Supp.3d at 878-79 (warning pandemic "'could'" impact "customer behavior and the demand for [defendant]'s products" insufficient where "those risks [ ] have already come to fruition"). Consequently, Defendants misplace reliance on the boilerplate warnings included in their motion. *See* Defs. Br. at 11-14.

### 4. Defendants' Misstatements Are Not Inactionable Opinions or Puffery

Defendants improperly contend that certain misstatements are inactionable statements of opinion or puffery. Defs. Br. at 16-18 (citing only ¶¶148, 163, 168, 170, 172, 188, 195, 199, 214). First, they selectively quote only certain portions of the challenged statements, omitting others that were not couched with any prefatory opinion language, such as "I think" or "I believe," but rather, "expresse[d] certainty" or described what Defendants have "seen"—*i.e.*, past or present trends—and thus are representations of facts. *Omnicare, Inc. v. Laborers Dist. Cncl. Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015); *In re QuantumScape Sec. Litig.*, 580 F.Supp.3d 714, 739 (N.D. Cal. 2022) (opinions actionable where alleged that "the supporting fact the speaker supplied is … capable of being proven true or false"). While these are not, "pure statements of opinion" are still actionable if they "omit[] material facts" that "conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 186, 189. "Where a defendant specifically references data and expresses optimism, the court will allow these statements to survive because either the defendant (1) read the relevant data and expressed optimism despite knowing the [buying patterns and sales pipeline] were not promising [] or (2) did not read the relevant data but was representing to shareholders that he had, and expressed unfounded/blind optimism, which in itself

15

is misleading." *Luo v. Spectrum Pharms., Inc.*, 2024 WL 4443323, at *11 (D. Nev. Oct. 7, 2024) (finding "'we feel really strong about … the data readout in Q4'" actionable).

They are also actionable because Defendants "lacked [a] basis for making those statements." *Omnicare,* 575 U.S. at 184-86, 196. They knew about the price sensitivity and its negative impact on expansion rates, and about adverse demand for platform-wide AI integration and negative customer feedback on AI products offered. Given the ramifications of then-current facts on future results, Defendants had no basis for making the statements they did, nor can they credibly claim after the fact that they simply believed in their predictions. Their public statements did not "fairly align[] with the information in [their] possession at the time." *Id.* at 189, 192 (defendant must "desist from misleading investors by saying one thing and holding back another"); *see also Glazer*, 63 F.4th at 768-69 (finding sales pipeline statements "did not reflect the actual state of [the company's] affairs at the time" when some of the "technical wins" described in statements were actually illusory); *In re BioVie Inc. Sec. Litig.*, 2025 WL 947667, at *13 (D. Nev. Mar. 27, 2025) (rejecting contention that statements were opinions where they "plausibly omit significant contemporaneous facts … rendering the anticipated dates for study completion improbable and bolstering an inaccurate impression about the strength of the Study and its data"). Defendants admitted as much when the reason for the lowered guidance was, in part, needing more time to "build its pipeline and close deals on new products;" with the partial rollback of the price increase and 60-day free trial of Duo for new and existing customers; and when Robins admitted the change caused "price sensitivity [] in SMB and mid-market." ¶¶122, 136-39; *see Hatamian v. Adv. Micro Devices, Inc.*, 87 F.Supp.3d 1149, 1160 (N.D. Cal. 2015) (finding "later admissions" supported falsity of statements when made); *see also Apple*, 2020 WL 2857397, at *16 (opinion actionable where "statement did not align with the information [defendant] possessed at the time" and "Apple itself admitted mere two months later" the problems that conflicted with prior statements).

Such statements are also not puffery because "when taken in context," they were concrete assurances about existing customer buying behaviors and product demand trends that were highly material and "address specific aspects of [GitLab]'s operation that [Defendants] kn[e]w[] to be performing poorly." *Quality Sys.,* 865 F.3d at 1143-44 ("non-forward-looking statements about

the state of [] sales pipeline," *e.g.*, "'there is nothing slowing down,'" not puffery); *see also Hammer v. Frontier Fin. Corp.*, 2011 WL 13229260, at *9 (W.D. Wash. Sept. 7, 2011) ("capital ratios remain strong" actionable because it referred to a specific area of defendants' business and investors were likely to rely on such a statement). This is further evidenced by analysts' repeated questions on these topics, as well as many analysts' reports positively covering such assurances. *See, e.g.*, ¶¶78-83, 89, 92-95, 100-01, 152-53, 155, 157, 166, 168, 170, 172-88, 201-14, 231-39; *see also Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 (C.D. Cal. Aug. 4, 2017) (statement material "[a]s evidenced by repeated questions posed by analysts").

### C.    The Complaint Adequately Alleges a Strong Inference of Scienter

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). It is sufficient to allege a defendant "omitted material information knowingly, intentionally, or with deliberate recklessness." *In re Alphabet Inc. Sec. Litig.*, 1 F.4th 687, 705 (9th Cir. 2021).[4] The "inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference is "strong" if a reasonable person would deem it "cogent and compelling" and "*at least as likely as* any plausible opposing inference." *Id.* at 324-29. As such, it "need not be irrefutable . . . or even the most plausible," no "smoking-gun" required. *Id*.

#### 1.    Access to Adverse Information Supports Strong Inference of Scienter

"The most direct way to show … that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). The reliable, interlocking accounts of four FEs and two CWs (the "witnesses") alleged here show that Defendants "were in possession of contemporaneous, contradictory information when they made the false and misleading statements." *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10-11

---

[4] Deliberate recklessness "presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* at 701.

(N.D. Cal. Apr. 28, 2020). The Complaint describes each witness' job title, their responsibilities, tenures, and for FE1, FE2, and FE4, to which executive they reported, to show that each was positioned to know the information attributed to them. ¶¶28-40, 109-18, 217-19; *see Quality Sys.*, 865 F.3d at 1145 (finding CWs reliable based on allegations of their "job description and responsibilities, and, *in some instances*, the witness's exact title and to which [] executive the witness reported"). Given their roles and responsibilities, Defendants' "quibbl[ing] that these witnesses weren't in a position to see the [information] first-hand" fails. *Berson*, 527 F.3d at 985.

Their claim that each witness should be disregarded because they do not allege direct contact with the Individual Defendants (Defs. Br. at 20) is an imagined requirement routinely rejected. *See Quality Sys.*, 865 F.3d at 1144 (crediting numerous lower-level sales representatives who provided fewer specific details than here and had no contact with individual defendants); *see also Roberts*, 2020 WL 2042244, at *10 (rejecting same contention finding "the CWs' personal knowledge of integration projects and customer feedback comes as a direct result of their positions in [company]").[5] Their attempt to discredit FE2 and FE4 based on the timing of their employment is a red herring. Defs. Br. at 21. The "proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in this case." *Zelman v. JDS Uniphase Corp.*, 376 F.Supp.2d 956, 971 (N.D. Cal. 2005); *see also Quality Sys.*, 865 F.3d at 1145 (accepting statements by CW not employed during class period but who had personal knowledge of defendants' real-time access to reports); *Roberts*, 2020 WL 2042244, at *10 (rejecting same contention where "none of the CWs w[ere] employed at [company] during the *entire* Class Period"). And their attempt to discredit CW1 and CW2 as non-employees is equally unavailing. Defs. Br. at 21. "Defendants overstate the rigidity of the personal knowledge requirement, which allows for various indicia of reliability." *BioVie*, 2025 WL 947667, at *19 (crediting CW providing accounts of a medical monitor contracted by independent auditing firm to investigate defendant's data issues alleging they were in possession of adverse information

---

[5] Defendants' reliance on an earlier decision is inapt because the *Quality Sys.* holding is clear and unlike the six witnesses here, *Intuitive Surgical* involved "a single statement by a lone [low-level] witness … who worked for [the company] for three months." 759 F.3d at 1063.

concluding "it appears reasonable that as a medical monitor, Osman would be positioned to know the information alleged"); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248, 1272 (N.D. Cal. 2000) (crediting newspapers articles that provide detailed factual allegations).

As detailed in Section II.B., *supra*, multiple witnesses offer specific, corroborative details of AI deployment and demand issues prior to and throughout the Class Period. *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *27 (N.D. Cal. Mar. 21, 2018) (finding similar accounts supportive of scienter as "the CWs corroborate each other with respect to what was going on internally at [the company], which further supports the reliability of their statements"). For example, as corroborated by FE4, CW1, and CW2, GitLab had not intended to, nor did it, develop AI features competitive to GitHub, rather it prioritized a product line tailored for a limited pool of customers, focused on speed throughout the DevSecOps workflows as opposed to accuracy and productivity. ¶¶112-13, 116. As corroborated by FE1 and CW1, demand for platform-wide AI integration was weak due to data privacy and security concerns, and as a result, customers did not see GitLab's AI features as a value add. ¶¶114, 117. FE1 also alleges repeated problems with exaggerating GitLab's AI capabilities, having an adverse impact on customer feedback, were reported to Defendants and other senior executives. ¶118; *see Robb v. Fitbit Inc*, 2017 WL 219673, at *7 (N.D. Cal. Jan. 19, 2017) (non-defendant executives' awareness of defects gave rise to inference that they would not keep that "secret from the company's CEO, CFO, and CTO").

Further, FE3 and FE4 offer corroborating accounts of meetings where Defendants received regular briefings on the development and status of GitLab's AI-product offering. ¶¶217-19; *see City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 527 F.Supp.3d 1151, 1187 (N.D. Cal. 2021) (scienter established by CW reports of meetings where defendants received regular briefing of topics identified in misstatements and where defendants approved of actions hidden from investors); *see also Scheller v. Nutanix, Inc.*, 2020 WL 5500422, at *9 (N.D. Cal. Sept. 11, 2020) (similar); *Brendon v. Allegiant Travel Co.*, 412 F.Supp.3d 1244, 1260-61 (D. Nev. 2019) (similar).

Also, Defendants controlled all aspects of GitLab, had access to proprietary information, and were responsible for approving and reporting its misleading financial and operational results. ¶¶220-28. In particular, Defendants had access to, and continually monitored, sales and customer

data which indicated as of 1Q24 expansion rates were declining as price sensitivity set in on the 53% increase in the Premium tier. ¶¶51-62; *see also* ¶¶157, 170, 197, 234, 238. Accordingly, Defendants knew or recklessly disregarded these "concrete warning signs" of waning or weak demand, "fail[ing] to tell investors about [these] risks while confidently touting" continued strong customer buying behaviors and denying adverse trends. *BioMarin*, 2022 WL 164299, at *13.

Additionally, the Ninth Circuit has repeatedly found that a defendant's public professions of knowledge and authority on a topic support scienter. *See Glazer*, 63 F.4th at 773; *Quality Sys*., 865 F.3d at 1145. This is particularly true here where Defendants consistently spoke publicly about customer buying behaviors in response to the price change, highlighting internal metrics tracked, and about demand for AI integration, detailing customer validation of GitLab's own AI features, demonstrating familiarity with the relevant subject matter. ¶¶78-80, 89, 125, 152-53, 155, 157, 166, 168, 170, 172-88, 201-14, 231-39; *see Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("inference that [defendant] did not have access to [relevant] data is directly contradicted by the fact that she specifically addressed it in her statement."); *Homyk v. ChemoCentryx, Inc*., 2023 WL 3579440, at *19 (N.D. Cal. Feb. 23, 2023) (scienter where defendant repeatedly discussed relevant subject matter "in detail" and "opin[ed] on the significance of particular data"); *Shenwick*, 282 F.Supp.3d at 1147 (actual access inferred when defendants "referenc[ed] the data directly").

Undeniably, GitLab's AI-product offering and Premium price increase were integral to its growth strategy. ¶¶229-30. Seeing their significance to GitLab's financial success, it is reasonable to infer at least deliberate indifference, especially in conjunction with allegations that (1) key internal metrics showed declining seat expansion which accounted for 80% of its quarterly revenue growth; (2) the adverse expansion rates indicated a disparate impact in its SMB and mid-market customers, roughly 30% of its customer base; (3) witness accounts corroborate that weak demand stemmed from the same data privacy and security concerns with AI integration throughout the software development lifecycle identified by Defendants in May 2023; and (4) the ultimate reasons for the lowered fiscal guidance and disappointing earnings reflected the same general problems— price sensitivity and weak product demand. *See Matrixx*, 563 U.S. at 49 (finding allegations gave rise to "compelling" inference that "Matrixx elected not to disclose adverse event reports not

because it believed they were meaningless but because it understood their likely effect on the market"); *see also BioMarin*, 2022 WL 164299, at \*13 (that "defendants made statements later that … contradict the statements they made during the [c]lass [p]eriod]" supported scienter).

Accordingly, "it would be 'absurd' to suggest that management was without knowledge of" the adverse response to GitLab's price change and AI-product offering and the materialized risks thereto when they made the alleged misstatements. *Reese,* 747 F.3d at 576; *see also E. Ohman J:or Fonder AB v. NVIDIA Corp*., 81 F.4th 918, 946 (9th Cir. 2023) (finding "obvious" inference of scienter due to CEO's familiarity with business operations); *Alphabet*, 1 F.4th at 706 (finding "compelling inference that the senior executive knew of the information at issue" based on their "role in [the] company" and "importance of information" to its operations); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (core operations allegations combined with "specific allegations about management's exposure to factual information" supported scienter); *Zhou v. Faraday Future Intell. Elec. Inc.*, 2022 WL 13800633, at \*10 (C.D. Cal. Oct. 20, 2022) (scienter where "sales and production of the [vehicle] impacted [defendant's] core business operations").

### 2.    Suspicious Timing of Departures Bolsters Scienter Inference

Uncharacteristic resignations of high-level executives can add to the scienter inference. *See, e.g., In re Plantronics, Inc. Sec. Litig*., 2022 WL 3653333, at \*19 (N.D. Cal. Aug. 17, 2022); *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at \*6-7 (N.D. Cal. June 1, 2020); *In re UTStarcom, Inc. Sec. Litig.*, 617 F.Supp.2d 964, 976 (N.D. Cal. 2009) (holding that suspiciously timed resignations were "one more piece to the scienter puzzle"). Here, multiple GitLab executives, including Sijbrandij, Chief Revenue Officers, Michael McBride and Chris Weber, Audit Committee member, Mark Porter, and Chief Accounting Officer, Erin Mannix, all abruptly resigned or stepped down from their positions at suspicious times even though they had significant financial incentives to stay. ¶¶223, 240-48. These resignations bolster the already-strong inference.

### 3.    Defendants Offer No Plausible Competing Inference

Defendants offer no competing non-fraudulent inference. Unable to do so, they overstate the significance of the fact that Plaintiff does not allege they financially benefited. Defs. Br. at 23-24. While "personal financial gain may weigh heavily in favor of a scienter inference[, t]he absence

of a motive allegation … is not fatal for allegations must be considered collectively." *Tellabs*, 551 U.S. at 310; *see also Am. W. Holding*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.").

### D.     The Complaint Adequately Alleges Loss Causation

"[L]oss causation is simply a variant of proximate cause." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024). "Plaintiffs need only show a 'casual connection' between the fraud and the loss, and they can do so even when the alleged fraud is not necessarily revealed prior to the economic loss." *Id*. at 1184. "[L]oss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). As such, the Ninth Circuit "take[s] 'a flexible approach' in evaluating whether some event or occurrence revealed fraud to market … consider[ing] whether an alleged revelation 'contain[s] enough information to significantly undermine' the allegedly false misrepresentation." *Genius*, 97 F.4th at 1184. This "should not prove burdensome, for even under Rule 9(b) … allegations will suffice so long as they give the defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *In re Bofi Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).

Loss causation is readily apparent here. The Complaint plausibly alleges that Defendants misstated the capabilities and functionality of GitLab's primary product initiatives causing low customer adoption and cost sensitivity under its new pricing model resulting in a decline in demand and weak revenue growth, and the lower-than-expected FY2025 guidance disclosed on March 4, and the additional revenue guidance headwind, quarterly earnings miss by 5 points below estimates, and sequential drop in dollar-based net retention rates disclosed on June 3, undermined the veracity of those prior statements, which in turn, caused GitLab's stock to drop 21% the day after the first partial disclosure and 5% the day after the second. ¶¶249-59. Indeed, on March 4 investors learned that GitLab lowered its revenue guidance because it was "seeing normalization in buying behavior" reducing the impact of the Premium price increase in FY2025 and it needed more time to "build its pipeline and close deals on new products." ¶¶254-55. And the June 3 disclosure caused investors and analysts to tie the disappointing earnings and declining retention rates to customer reluctance

of the Premium price increase with, *inter alia*, an J.P. Morgan analyst noting that while the Company raised its fiscal guidance, it "didn't raise the FY pricing benefit assumption and nor did it reiterate it" and an analyst from Barclays Capital reporting a trend of declining net seat expansion in the Premium tier throughout the Class Period and noting GitLab "starts to lap contributions from its Premium tier price increase from here." ¶¶131-33, *see also* ¶260-61. Nothing more is required to show Defendants "misrepresented or omitted the *very facts* that were a substantial factor in causing [Plaintiff's] economic loss." *First Solar*, 881 F.3d at 753; *Backe*, 642 F.Supp.2d at 1188 (loss causation where below estimates guidance "undermined [defendants'] statements concerning product demand and the superiority of its products" and subsequent earnings shortfall "undercut Defendants' previous statements concerning product demand and ability to compete"); *Leventhal v. Chegg, Inc*., 721 F.Supp.3d 1003, 1017-18 (N.D. Cal. 2024) (loss causation where analysts noted connection between lowered guidance and alleged misstatements); *Felipe v. Playstudios Inc.*, 2024 WL 1380802, at *18 (D. Nev. Mar. 31, 2024) (loss causation where defendant lowered its expected revenues and the reason given for the decline "related" to the alleged fraudulent practices).

Contrary to Defendants' assertions (Defs. Br. at 24-25), "[a] corrective disclosure [ ] need not 'precisely mirror' the misrepresentation." *Genius*, 97 F.4th at 1184. The Ninth Circuit also considers whether "the 'market understood' the alleged revelation as 'a revelation of fraud' and responded accordingly." *Id.* As such, "Plaintiff need not allege facts consistent with a revelation-of-the-fraud theory to plausibly allege loss causation, where, as here, it has plausibly alleged loss causation under a cognizable alternative theory." *In re Splunk Inc. Sec. Litig.,* 592 F.Supp.3d 919, 952 (N.D. Cal. 2022) (loss causation where alleged stock drop was caused by earnings miss that, in turn, "was caused by the undisclosed actions regarding which Defendants allegedly misled investors"). As discussed above, Plaintiff has alleged sufficient facts to causally tie Defendants' misstatements concerning AI-driven growth and Premium pricing impact to the lowered guidance followed by additional guidance headwind, below-estimates earnings and a drop in DBNRR, causing GitLab's stock to drop. *See In re Impinj, Inc. Sec. Litig*., 414 F.Supp.3d 1327, 1368 (W.D. Wash. 2019) (finding allegations that, defendants misrepresented the functionality of primary product causing demand to drop resulting in a decline in revenue which, when disclosed, caused a

23

stock drop, "steps in [a] causal chain [that were] all plausible and foreseeable"); *see also Thant v. Rain Oncology Inc.*, 2025 WL 588994, at \*10 (N.D. Cal. Feb. 24, 2025) (loss causation where similar casual chain allegations "fit precisely into a 'materialization of the risk' theory").[6]

Defendants also improperly imply some cutoff for how much a stock price must decline. Defs. Br. at 25. Courts have routinely found similar drops sufficient. *See N.Y. Hotel Trades Cncl. & Hotel Ass'n of NYC, Inc. Pension Fund v. Impax Lab'ys, Inc.*, 843 F.App'x 27, 31 (9th Cir. 2021) and Appellant's Opening Brief, 2020 WL 957066, at \*15 (9th Cir. Feb. 14, 2020) (loss causation where disclosure resulted in 2.7% drop and subsequent disclosure resulted in 5% drop); *see also Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1203 (9th Cir. 2020) (4.57% drop); *Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936, at \*13 (N.D. Cal. Mar. 16, 2020) (4.9% drop); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at \*14-15 (N.D. Cal. Feb. 15, 2018) (rejecting same argument finding 5.4% drop over two days sufficient).[7] The Ninth Circuit has also explained that certain disclosures may result in smaller drops where prior disclosures removed inflation. *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016); *see*, *e.g.*, *Zhu v. Taronis Techs. Inc.*, 2020 WL 1703680, at \*6 (D. Ariz. 2020) (loss causation where subsequent disclosure "had a minimal effect on [defendant's] stock price"); *Rok*, 2017 WL 35496, at \*19 (noting "no stock price drop need accompany the subsequent corrective disclosure"). Thus, while a 5% decline is sufficient, it is notable that the stock had already dropped 21% on the prior disclosure. "To the extent that Defendants are arguing that the stock decline was the result of non-

[6] Defendants' cited authorities are easily distinguishable. In *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828 (9th Cir. 2022), disappointing results of a different drug trial did not reveal the alleged fraudulent manipulation of data in an earlier trial. *Id.* at 839. In *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), "the announcement of an investigation, without more," only provided "notice of a *potential* future disclosure of fraudulent conduct." *Id.* at 890. In *Rok v. Identiv, Inc.*, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017), the second partial disclosure "added no new information … 'reiterating and re-emphasizing' prior disclosure." *Id.* at \*18. In *Curry v. Yelp, Inc.*, 2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), "like … in *Loos*," the FTC disclosure of customer complaints, without subsequent investigation, revealed only the "possibility" of fraud, and the WSJ article discussing the FTC complaints came out after the alleged stock drop occurred. *Id.* at \*11.

[7] Defendants' reliance on *Camp v. Qualcomm Inc.*, 2020 WL 1157192 (S.D. Cal. Mar. 10, 2020) is inapt. There, while referring to the 4% decline as "minimal," the court ultimately found "there [was] a more plausible explanation" in that the market reacted to news of CFIUS' investigation of the merger and not that defendant's unilaterally notified CFIUS of the transaction. *Id.*, at \*1, \*6.

24

fraudulent factors … such an argument is premature." *Waterford Twp. Police v. Mattel, Inc.*, 321 F.Supp.3d 1133, 1157 (C.D. Cal. 2018); *cf. Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013) (examining evidence at summary judgment).

**E.     The Complaint Adequately Pleads "Control Person" Liability**

Because a primary violation is adequately pleaded, Plaintiff has rebutted Defendants only argument against secondary liability under Section 20(a) (*see* Defs. Br. at 25). *Khoja*, 899 F.3d at 1018. They cannot now contest this point. *See Graves*, 623 F.3d at 1048.

**F.     Any Dismissal Without Leave to Amend and With Prejudice Is Unwarranted**

As detailed herein, Plaintiff submits that each claim is properly pleaded in all respects. Nevertheless, should the Court grant, in whole or part, Defendants' motion, Plaintiff respectfully requests leave to amend to cure any perceived deficiencies. *See Osher v. JNI Corp.*, 183 Fed. Appx. 604, 605 (9th Cir. 2006) (vacating dismissal of third amended complaint noting "[l]eave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet"); *see, e.g.*, *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("drafting of a cognizable complaint can be a matter of trial and error."). Contrary to Defendants' distorted assertion of "ample opportunity to meet the strict pleading standards" (Defs. Br. at 25), Plaintiff voluntarily amended twice, not on instruction to cure any deficiencies. Absent "a strong showing of any…*Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence*, 316 F.3d at 1052.

**V.     CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.

//

//

//

//

//

//

//

Dated: April 25, 2025                              Respectfully submitted,

                                                  **LEVI & KORSINSKY, LLP**

                                                  */s/ Adam M. Apton*                      _
                                                  Adam M. Apton (SBN 316506)
                                                  1160 Battery Street East, Suite 100
                                                  San Francisco, CA 94111
                                                  Tel.: (415) 373-1671
                                                  Email: aapton@zlk.com

                                                  *Attorneys for Lead Plaintiff Dutch Smith*
                                                  *and Lead Counsel for the Class*

OPPOSITION TO MOTION TO DISMISS
                                                  CASE NO. 5:24-CV-06244-EKL