IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


DOLLY,                              )   CV-24-6244-EKL
                                    )
                PLAINTIFF,          )   SAN JOSE, CALIFORNIA
                                    )
        VS.                         )   AUGUST 7, 2025
                                    )
GITLAB INC., ET AL,                 )   PAGES 1-31
                                    )
                DEFENDANTS.         )
                                    )
_____    )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EUMI K. LEE
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

FOR THE PLAINTIFF:      LEVI & KORSINSKY, LLP
                        1160 BATTERY STREET EAST, SUITE 100
                        SAN FRANCISCO, CA 94111
                    BY: **ADAM APTON**


FOR THE DEFENDANT:      FENWICK & WEST LLP
                        555 CALIFORNIA STREET, SUITE 1200
                        SAN FRANCISCO, CA 94104
                    BY: **CATHERINE KEVANE**


FOR THE DEFENDANT:      FENWICK & WEST LLP
                        555 CALIFORNIA STREET, 12TH FLOOR
                        SAN FRANCISCO, CA 94104
                    BY: **FIONA TANG**
                        **JOSHUA PARR**


OFFICIAL COURT REPORTER:    SUMMER FISHER, CSR, CRR
                            CERTIFICATE NUMBER 13185

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

SAN JOSE, CALIFORNIA                    AUGUST 7, 2025

P R O C E E D I N G S

(COURT CONVENED AT 1:41 P.M.)

THE CLERK:  WE ARE CALLING CASE 5-24-CV-6244-EKL.
DOLLY VERSUS GITLAB INCORPORATED, ON FOR A MOTION TO DISMISS.

COUNSEL, PLEASE COME FORWARD AND STATE YOUR APPEARANCES ON
THE RECORD STARTING WITH COUNSEL FOR THE PLAINTIFF.

MR. APTON:  GOOD AFTERNOON, YOUR HONOR.

MY NAME IS ADAM APTON, I'M FROM LEVI & KORSINSKY AND I
REPRESENT THE PLAINTIFF.

THE COURT:  GOOD AFTERNOON.

MS. KEVANE:  GOOD AFTERNOON, YOUR HONOR.

CATHERINE KEVANE FOR ALL OF THE DEFENDANTS, AND I WILL LET
MY COLLEAGUES INTRODUCE THEMSELVES.

THE COURT:  GOOD AFTERNOON.

MS. TANG:  GOOD AFTERNOON.

FIONA TANG ON BEHALF OF THE DEFENDANTS.

MR. PARR:  GOOD AFTERNOON.  JOSHUA PARR.

THE COURT:  ALL RIGHT.  GOOD AFTERNOON, EVERYBODY.

ALL RIGHT.  WE ARE HERE ON DEFENDANT'S MOTION TO DISMISS.
THE COURT HAD E-MAILED OUT A TENTATIVE RULING AND A FULL
TENTATIVE ORDER.

SO WITH THAT, AND I INDICATED TO PARTIES THAT IT WOULD BE
ABOUT 20 TO 25 MINUTES PER SIDE, IF NECESSARY, IT MIGHT NOT BE
GIVEN THE NATURE IN HOW EXTENSIVE THE TENTATIVE WAS, BUT WITH

THAT, I WILL BEGIN WITH THE MOVING PARTY, UNLESS YOU WANT TO RESERVE FOR REBUTTAL.

MS. KEVANE:  THANK YOU, YOUR HONOR.

WOULD YOU LIKE ME TO APPROACH THE PODIUM OR BE AT THE DESK?

THE COURT:  PLEASE APPROACH THE PODIUM.

MS. KEVANE:  AS YOU PRE-STAGED, YOUR HONOR, WE WILL RESERVE FOR REBUTTAL.  WE WERE QUITE PLEASED WITH THE TENTATIVE ORDER AND FOUND IT WELL REASONED AND THOROUGH.

THANK YOU.

THE COURT:  OKAY.  THANK YOU.

MR. APTON:  THANK YOU, YOUR HONOR.  ADAM APTON AGAIN FOR PLAINTIFFS.

SO YOUR HONOR, IF I MAY, THANK YOU FOR THE TENTATIVE, IT'S HELPFUL, IT GUIDES THE CONVERSATION, ESPECIALLY IN THESE SORTS OF CASES WHERE THERE IS A LOT OF ISSUES MOVING AROUND.

I THINK, RESPECTFULLY, THAT THERE PERHAPS MIGHT HAVE BEEN TWO MISREPRESENTATIONS OR CATEGORIES OF MISREPRESENTATIONS THAT WERE OVERLOOKED.  I WOULD LIKE TO TALK TO THE COURT ABOUT THAT, AND THEN I WOULD ALSO LIKE TO SPEAK TO THE COURT ABOUT THE STANDARD IT APPLIED FOR THE LOSS CAUSATION ELEMENT.

THE COURT:  ALL RIGHT.

MR. APTON:  AND YOUR HONOR, I HAVE CITATIONS TO SPECIFIC PAGES AND PARAGRAPHS OF THE AMENDED COMPLAINT, I DON'T KNOW IF THAT WOULD BE HELPFUL.

THE COURT:  VERY HELPFUL.  AND I ACTUALLY BROUGHT A COPY OF THE AMENDED COMPLAINT WITH ME, SO WE ARE ON THE SAME PAGE.

MR. APTON:  VERY GOOD.  THANK YOU, YOUR HONOR.

SO WITH THAT, THERE'S TWO CATEGORIES OF MISREPRESENTATIONS, THE FIRST BEING MADE BY DEFENDANT SYTSE SIJBRANDIJ AND THE SECOND BY DEFENDANT BRIAN ROBBINS.  MR. SIJBRANDIJ WAS THE CEO AND MR. ROBBINS WAS THE CFO, AND THE SUBJECT MATTER OF THEIR RESPECTIVE STATEMENTS DIFFERS.

WITH RESPECT TO MR. SIJBRANDIJ'S STATEMENTS, THERE ARE TWO IN PARTICULAR, AND THEY SPEAK TO THE AVAILABILITY OF THE AI FEATURES WITHIN THE GITLAB SUITE.

WE ALLEGE THAT THOSE AI FEATURES WERE AVAILABLE ONLY VIA SAAS, SOFTWARE AS A SERVICE, OR CLOUD-BASED.  SO THERE WERE SOME CUSTOMERS OF GITLAB, A MATERIAL PORTION OF THE CUSTOMERS THAT HAD "COMPLEX SECURITY COMPLIANCE AND REGULATORY REQUIREMENTS" THAT WERE UNCOMFORTABLE OR UNABLE TO ACCESS THOSE AI FEATURES BECAUSE THEY DIDN'T WANT TO LOG INTO A CLOUD-BASED SUBSCRIPTION.

AND SO WHEN MR. SIJBRANDIJ IS SPEAKING, SPECIFICALLY AT PARAGRAPH 178 WHICH IS A STATEMENT ON SEPTEMBER 7TH, 2023, THAT'S PAGE 58 OF THE COMPLAINT, LINES 20 THROUGH 22, MR. SIJBRANDIJ SAYS, "THERE ARE TEN AI FEATURES USEABLE BY CUSTOMERS TODAY, THREE TIMES MORE THAN THE COMPETITION."

SIMILARLY, ON DECEMBER 4TH, 2023, PARAGRAPH 195, PAGE 68,

LINE 7 THROUGH 10, "THERE ARE 14 AI FEATURES AVAILABLE WITHOUT SACRIFICING PRIVACY, SECURITY AND COMPLIANCE."

THOSE STATEMENTS PRESENT A PICTURE TO ANALYSTS, WHO ARE PAYING VERY CLOSE ATTENTION TO THIS, THAT GITLAB'S AI FEATURES ARE AVAILABLE WIDELY TO THEIR CUSTOMER BASE, WHEN IN REALITY A MATERIAL PORTION OF THOSE CUSTOMERS, LIKELY ENTERPRISE CUSTOMERS, WERE UNABLE TO ACCESS THOSE PRODUCTS, THOSE FEATURES.

THAT'S IMPORTANT BECAUSE -- THERE'S ONE MORE MISREP ACTUALLY, ALSO ON DECEMBER 4TH, 2023, IT'S PARAGRAPH 203, PAGE 73, LINES 8 THROUGH 19.  AND THIS ONE IS IMPORTANT BECAUSE IT'S IN DIRECT RESPONSE TO AN ANALYST QUESTION DURING THE Q&A SESSION.

THE ANALYST IS ASKING IF THERE'S A DIFFERENCE IN FEATURE FUNCTIONALITY BETWEEN SAAS AND SELF-MANAGED.  SELF-MANAGED REFERS TO A NON CLOUD-BASED PROGRAM, AND MR. SIJBRANDIJ SAYS ONCE AGAIN "THERE'S 14 FEATURES AVAILABLE."

SO HE REITERATES THAT THESE FEATURES ARE AVAILABLE TO ALL OUR CUSTOMERS WITHOUT ANY DISTINCTION BETWEEN WHAT'S ON THE CLOUD AND WHAT'S NOT ON THE CLOUD.

AND AS I WAS SAYING BEFORE, THAT'S IMPORTANT BECAUSE ANALYSTS ARE USING IT TO DETERMINE WHETHER OR NOT GITLAB IS GOING TO HAVE THE ABILITY TO BE WIDESPREAD IN THE MARKET TO COMPETE WITH MICROSOFT'S GITHUB.

SO IF THESE ANALYSTS ARE LEAD TO BELIEVE THAT GITLAB'S

FEATURES ARE BEING FULLY UTILIZED AND OUT THERE, THERE'S A GREATER LIKELIHOOD OF MARKET PENETRATION, CUSTOMER ADOPTION, SO ON AND SO FORTH, WITH MORE REVENUE.

THE COURT:  LET ME ASK A COUPLE QUESTIONS.

WHAT WAS THE LAST CITATION THAT YOU HAD -- WHAT WAS YOUR LAST CITE TO THE COMPLAINT?

MR. APTON:  THE THREE MISREPRESENTATIONS, THE THIRD ONE THAT I MENTIONED WAS PARAGRAPH 203, PAGE 73, LINES 8 THROUGH 19.

THE COURT:  SO ON PAGE 18 OF THE TENTATIVE, THE COURT TALKS ABOUT THE FACT THAT IT WAS FINDING THAT THERE WASN'T THAT FALSITY BECAUSE THESE FEATURES WERE GENERALLY AVAILABLE AND THAT THE FACT THAT IT WAS GENERALLY AVAILABLE IN TERMS OF THE STATEMENTS GITLAB WAS MAKING WAS SUFFICIENT IN CONTRAST TO, SO THAT THERE WASN'T THAT MISREPRESENTATION BECAUSE THEY WEREN'T SAYING IT WAS AVAILABLE -- EACH FEATURE WAS AVAILABLE EVERY TIME TO EVERY CUSTOMER.

SO TALK ME THROUGH YOUR ARGUMENT ON THAT VERSUS WHAT THE TENTATIVE SAID.

MR. APTON:  SURE.

SO YOUR HONOR, THERE IS A LINE OF CASES WHICH I'M SURE THE COURT IS FAMILIAR WITH THAT STATEMENTS CAN BE LITERALLY TRUE BUT STILL MISLEADING, AND THIS IS THAT INSTANCE.  YES, LITERALLY, THESE FEATURES ARE GENERALLY AVAILABLE TO THE CUSTOMERS, PRACTICALLY IN REAL WORLD, IN REAL WORLD USE, NOT

ALL OF THOSE CUSTOMERS ARE GAINING ACCESS TO THOSE FEATURES BECAUSE THE ENTERPRISE CUSTOMERS, AGAIN THOSE WITH COMPLEX SECURITY COMPLIANCE AND REGULATORY REQUIREMENTS, ARE NOT LOGGING INTO THE CLOUD SO THEY ARE NOT BENEFITTING FROM THOSE CUSTOMERS.

AND SO THERE IS A MATERIAL SEGMENT OF GITLAB'S CUSTOMER BASE THAT IS NOT ABLE TO REALIZE THE BENEFIT OF THIS AI SUITE, THEY ARE LESS LIKELY TO RENEW.

THE COURT:  ARE THERE ALLEGATIONS IN THE COMPLAINT ABOUT THE -- WHAT PERCENTAGE OR THAT THIS WAS -- BECAUSE YOU JUST USED THE WORD "MATERIAL," RIGHT, THAT THERE IS A MATERIAL SEGMENT OF THE CUSTOMER BASE.

SO WHAT ALLEGATIONS IN THE COMPLAINT GO TO -- BECAUSE IT COULD BE -- TO TRY TO DRAW THAT DISTINCTION, BECAUSE IT DOES SAY "GENERALLY AVAILABLE TO CUSTOMERS."  SO WHAT'S "GENERALLY AVAILABLE?"

MR. APTON:  TRUE, YOUR HONOR.

SO WE KNOW THAT APPROXIMATELY 60 PERCENT OF GITLAB'S ARR OR REVENUE IS FROM PREMIERE SUBSCRIPTIONS -- PREMIUM SUBSCRIPTIONS, EXCUSE ME.  AND ROUGHLY 60 PERCENT OF ITS CUSTOMER BASE IS SMALL, MIDSIZE BUSINESSES.

SO FROM THAT WE CAN ASSUME THAT THERE IS ABOUT 30 OR 40 PERCENT OF CUSTOMERS THAT ARE ENTERPRISE THAT FACE THESE ISSUES, THESE COMPLEX SECURITY COMPLIANCE AND REGULATORY REQUIREMENTS.

THE COURT:  AND CONTINUING, WHAT ABOUT THE PART OF THE TENTATIVE, THE SAME PARAGRAPH LOOKING AT THIS WHERE IT STATES, LINE 13 THROUGH 14, "IN ANY EVENT, DEFENDANTS DISCLOSE THAT FROM ANY FEATURES THAT INTERACT WITH CUSTOMER SOURCE CODE LIKE CODE SUGGESTIONS AND EXPLAIN THIS VULNERABILITY, GITLAB USES MODELS THAT RESIDE COMPLETELY WITHIN THE CLOUD INFRASTRUCTURE TO HELP SAFEGUARD THE CUSTOMER'S INTELLECTUAL PROPERTY."

MR. APTON:  YOUR HONOR, I WILL ANSWER JUST THE 60 PERCENT AND PERCENTAGE MATERIAL SEGMENT OF THE ALLEGED CUSTOMER BASE THAT HAS THESE SECURITY ISSUES, PARAGRAPHS 57 AND 58 IS WHAT I WAS DRAWING FROM.

THE COURT:  THANK YOU.

ACTUALLY THAT'S HELPFUL BECAUSE I WAS GOING TO CALCULATE THOSE PERCENTAGES WHILE WE WERE TALKING.

MR. APTON:  SURE.

AND YOU KNOW, YOUR HONOR, AT THE END OF THIS I WILL ASK IF I HAVE NOT SUCCESSFULLY CHANGED YOUR HONOR'S MIND, WHAT WOULD BE HELPFUL WOULD BE GUIDANCE IN TERMS OF WHAT THE COURT MIGHT LIKE TO SEE IN THE NEXT VERSION OF THE COMPLAINT.

SO IF IT'S MORE DETAIL AROUND WHAT PORTION OF GITLAB'S CUSTOMER BASE WAS HAVING THESE ISSUES, WAS SUBJECT TO THESE HEIGHTENED SECURITY REQUIREMENTS, THAT WOULD BE HELPFUL TO KNOW.

BUT IF I MAY, I WILL ANSWER YOUR QUESTION, YOUR HONOR.

WHAT YOUR HONOR IS GETTING AT IS A DIFFERENT TYPE OF SECURITY REQUIREMENT THAN THE ONE I WAS SPEAKING OF.  WHAT YOUR HONOR WAS REFERRING TO WAS A POLICY WITHIN GITLAB TO PROTECT CUSTOMERS' INTELLECTUAL PROPERTY, NOT CREATING A SAFE ONLINE SPACE FOR THESE CUSTOMERS TO COME IN AND UTILIZE THE AI FEATURES.

WHAT YOUR HONOR WAS REFERRING TO WAS GITLAB'S INTERNAL POLICY OF NOT SHARING CUSTOMER CODE, CUSTOMER IP PUBLICLY, MAKING SURE THAT IT'S SAFE AND SECURE.

AGAIN, THAT'S SEPARATE AND APART FROM THE SECURITY REQUIREMENTS WHICH I WAS REFERRING TO WHICH IS THESE ENTERPRISE CUSTOMERS HAVE HEIGHTENED REGULATORY REQUIREMENTS THAT DO NOT ALLOW THEM TO ACCESS CLOUDS FOR SOFTWARE SERVICES.

THE COURT:  OKAY.  CONTINUE.

MR. APTON:  SO YOUR HONOR, THE SUPPORT WE HAVE FOR THIS HEIGHTENED REGULATORY REQUIREMENT ISSUE AND HOW ENTERPRISE CUSTOMERS WEREN'T ABLE TO BENEFIT FROM THESE AI FEATURES, IT'S PARAGRAPH 114 AND PARAGRAPH 117.  AND THAT QUOTES FROM CONFIDENTIAL WITNESS 1 AND FORMER EMPLOYEE 1 WHO SAY THAT YES, ENTERPRISE CUSTOMERS -- I'M PARAPHRASING NOW -- ENTERPRISE CUSTOMERS WERE NOT ABLE TO TAKE FULL ADVANTAGE OF THE AI FEATURES IN THIS GITLAB SUITE BECAUSE THEY WERE NOT ABLE TO USE CLOUD-BASED SOFTWARE AS A SERVICE, SAAS.

AND I WOULD SUBMIT THAT THOSE PARAGRAPHS BETWEEN CW1 AND FE1 ARE SUFFICIENT TO GET THAT ALLEGATION ACROSS THE THRESHOLD

OF PARTICULARITY.  AND FOR THAT POSITION, I RELY ON THE FORESCOUT CASE, 63 F.4TH AT 768, THAT'S A NINTH CIRCUIT CASE, VERY RECENT, IT IS ON POINT HERE, IT TALKS ABOUT WHEN CW ALLEGATIONS ARE ENOUGH AND WHEN FALSITY IS PLEADED PROPERLY. IT TALKS ABOUT NOT HOLDING PLAINTIFFS TO SUCH A HIGH STANDARD TO MAKE PLEADING A CASE A FORMIDABLE ENDEAVOR.

WITH OUR ALLEGATIONS IN PARAGRAPHS 114 AND 117, WE HAVE ADEQUATELY ALLEGED THAT THESE ENTERPRISE CUSTOMERS COMPRISE A MATERIAL COMPONENT OF GITLAB'S CUSTOMER BASE, WERE UNABLE TO TAKE ADVANTAGE OF THOSE AI FEATURES, MEANING THAT WHAT MR. SIJBRANDIJ SAID, WE HAVE 10, 14 AI FEATURES AVAILABLE FOR USERS, THEY ARE USING THEM, IT WAS NOT FULLY ACCURATE. LITERALLY TRUE, PERHAPS, BUT MATERIALLY MISLEADING.

THE COURT:  I WILL LEAVE THAT RIGHT THERE FOR NOW BUT I MAY HAVE SOME FOLLOW-UP QUESTIONS.

MR. APTON:  SURE.

THE SECOND CATEGORY OF MISREPRESENTATIONS WERE THOSE MADE BY MR. ROBBINS, THE CFO, AND THESE RELATE TO THE PRICE INCREASE THAT GITLAB INSTITUTED AT THE BEGINNING OF THE CLASS PERIOD.

FOR PREMIUM SUBSCRIPTIONS THAT MADE UP 60 PERCENT OF GITLAB'S REVENUE, THEY INCREASED THE PRICE FROM $19 TO $29.  WE ALLEGE THAT WHEN MR. ROBBINS DISCUSSED THAT PRICE INCREASE IN CERTAIN CAPACITIES, AND I WILL IDENTIFY THOSE, THAT HE WAS MISLEADING INVESTORS BECAUSE HE WAS CONCEALING A PRICE SENSITIVITY, MEANING THAT IT WAS NOT TEMPORALLY RELATED TO

MACRO TRENDS BUT RATHER SOMETHING STRUCTURAL THAT NEEDED TO BE FIXED WITHIN GITLAB'S PRICING WHICH ANALYSTS WERE RELYING ON WHEN MODELLING WHAT THEY WERE EXPECTING FOR REVENUE AND GUIDANCE AND STOCK PRICE.

SO WE HAVE MISREPRESENTATIONS, AND I WILL IDENTIFY THEM NOW:

JUNE 5TH, 2023.  PARAGRAPH 157, WHICH IS PAGE 47, LINES 17 TO 21.

SEPTEMBER 5TH, 2023.  PARAGRAPH 170, PAGE 54, LINES 22 TO 25.

SEPTEMBER 12TH, 2023.  PARAGRAPH 184, PAGE 62, LINES 5 TO 6.  AND ALSO 13 TO 15.

AND THEN FINALLY DECEMBER 4TH, 2023.  PARAGRAPH 197, PAGE 70, LINES 20 TO 21.

FOUR INSTANCES IN WHICH MR. ROBBINS DISCUSSES "POCKETS OF WEAKNESS," "CONTRACTION" IN TERMS OF BUYING BEHAVIOR, CAUTIOUS BUYING BEHAVIOR, CONTRACTION OF PREMIUM SUBSCRIPTIONS.  HE'S REFERRING TO THOSE WHEN HE'S SPEAKING AS A TEMPORAL ISSUE RELATING TO MACRO CONCERNS WHEN WE KNOW BASED ON LATER ADMISSIONS THAT IT WAS ACTUAL PRICING SENSITIVITY.  IN OTHER WORDS, THEY RAISED THE PRICE TOO HIGH, TOO FAST, AND PEOPLE WEREN'T BUYING IT SO THEY ROLLED IT BACK.

THAT WAS A BIG DEAL BECAUSE ANALYSTS WERE RELYING ON MR. ROBBINS'S REPRESENTATIONS TO FACTOR IN WHAT REVENUE WAS GOING TO LOOK LIKE GOING FORWARD.  THESE SUBSCRIPTIONS ARE ON

AVERAGE, A 15-MONTH TIME TABLE.  IF THEY BELIEVE THAT USERS ARE PAYING $29 PER MONTH FOR A 15-MONTH PERIOD, THEY CAN RELY ON THAT IN TERMS OF MODELLING.

AND SO WHEN MR. ROBBINS THEN WALKED IT BACK AND SAID, ACTUALLY WE WERE HAVING PRICE SENSITIVITY, WE ARE NOW DROPPING THE PRICE FROM $29 BACK TO $19, AND WE ARE GIVING AWAY OUR DUO SUITE FOR FREE, THAT WAS A BIG DEAL, THAT WAS THE END OF THE CLASS PERIOD.

THE COURT:  SO WHAT'S THE BASIS FOR SCIENTER IN TERMS OF THIS GROUP OF ALLEGED MISREPRESENTATIONS?

MR. APTON:  FOR NUMBER TWO?  THE BASE FOR SCIENTER IS YOU HAVE MR. ROBBINS PUBLICLY ADDRESSING THIS, REFERRING TO THE PRICE SENSITIVITY AS TEMPORAL CONTRACTION AND BUYING BEHAVIOR.

SO HE'S SPEAKING ABOUT IT, HIS STATEMENTS TO THE PUBLIC REFLECT THAT HE'S ACTIVELY MONITORING IT, AND THAT IS ENOUGH TO SHOW THAT HE'S FAMILIAR WITH THE INFORMATION THAT'S BEING CONCEALED.

THE COURT:  HE'S FAMILIAR ENOUGH WITH -- I MEAN, IS THAT SUFFICIENT?  BECAUSE WHAT IF HE WAS JUST WRONG, FOR EXAMPLE?

MR. APTON:  THAT COULD BE A DEFENSE AT A LATER POINT IN THIS CASE, BUT AT THE PLEADING STAGE, IT'S NOT, BECAUSE UNDER FORESCOUT AND QUALITY SYSTEMS, WHEN YOU HAVE DEFENDANTS MAKING REPRESENTATIONS ABOUT INFORMATION, AND I SHOULD ALSO MENTION REESE V. MALONE, THAT IS THE SUREST WAY TO ALLEGE THAT

A DEFENDANT HAS INFORMATION ABOUT THE TOPIC WITH WHICH THEY ARE DISCUSSING.

THE COURT:  SO CONTINUING DOWN THE SCIENTER PATH, BECAUSE OFTEN IT'S INFERRED FROM THE CIRCUMSTANCES IN TERMS OF WHAT OTHER INFORMATION HE SHOULD HAVE KNOWN OR KNEW AT THAT TIME.  ARE THERE ANY OTHER ALLEGATIONS ABOUT WHAT ELSE HE KNEW?

MR. APTON:  SO WE DO KNOW BASED ON POST-CLASS PERIOD INFORMATION, CERTAIN THINGS.

PARAGRAPH 132, PAGE 36, LINES 15 THROUGH 26, THERE IS A CHART FROM AN ANALYST REPORT SHOWING THIS --

THE COURT:  WHAT WAS THE PAGE NUMBER AGAIN?

MR. APTON:  SORRY, PAGE 36.  PARAGRAPH 132, PAGE 36. THERE IS A CHART SHOWING SLOWING GROWTH, SLOWING DECLINE IN THE PREMIUM SUBSCRIPTION AREA, STARTING AFTER THE PRICE INCREASE.

THAT IS INFORMATION THAT THE CFO CERTAINLY FOLLOWS.  AND I'M NOT JUST SAYING THAT BECAUSE THE CFO WOULD OF COURSE FILE THAT INFORMATION BUT BECAUSE HE'S OUT QUARTER AFTER QUARTER TALKING ABOUT IT, ANALYSTS ARE QUESTIONING HIM REPEATEDLY AS TO WHAT THE IMPACT OF THIS PRICE INCREASE IS GOING TO BE.

MR. APTON:  PARAGRAPH 136 TO 137, PAGE 37, 20 TO 26, THAT'S WHEN THEY ANNOUNCED THE ROLLBACK OF PRICING.

SO THAT'S SOMETHING AFTER THE FACT THAT HELPS SHOW THIS WAS PRICE SENSITIVITY, IT WASN'T A TEMPORAL MACRO ISSUE.

AND THEN WE HAVE AN ADMISSION FROM MR. ROBBINS HIMSELF, PARAGRAPH 139, PAGE 38, LINES 5 THROUGH 8 WHERE ROBBINS SAYS,

"WE WERE HAVING PRICE SENSITIVITY."

THE COURT:  AND THIS IS ALL AFTER THE FACT?

MR. APTON:  THOSE FEW POINTS ARE AFTER THE FACT BUT HIS STATEMENTS DURING THE CLASS PERIOD IN WHICH HE'S SAYING THIS IS JUST CONTRACTION, IT'S NORMALIZING, THAT IS DURING THE CLASS PERIOD, IN THE MOMENT, AT THE SAME TIME HE KNOWS THAT IT'S ACTUALLY PRICE SENSITIVITY.

SO IT'S POSSIBLE, YOUR HONOR THAT --

THE COURT:  SO IT'S POSSIBLE.

MR. APTON:  IT'S POSSIBLE.

THE COURT:  SO LET'S TALK ABOUT THE STANDARD THEN, GOING BACK TO SCIENTER, IN TERMS OF I HEAR WHAT YOU ARE SAYING ABOUT FORESCOUT THAT WE ARE ALSO AT THE MOTION TO DISMISS PHASE, BUT THE SCIENTER STANDARD ITSELF IS MORE POSSIBLE THAT HE KNEW IT WAS INCONSISTENT INFORMATION.  LIKE THE PLAUSIBILITY AND WHOSE BURDEN THAT IS, THE BURDEN ON THE PLAINTIFF, SO TALK TO ME ABOUT THE INTERMIXING OF THAT IN TERMS OF THE ALLEGATIONS YOU JUST GAVE ME.

MR. APTON:  SURE.

YOUR HONOR, I WOULD ALSO POINT OUT THE ALPHABET CASE WHICH IS ALSO ANOTHER RECENT NINTH CIRCUIT DECISION.  AND IT GOES THROUGH THE STANDARD IN THAT CASE WHERE IF BOTH INFERENCES ARE EQUAL, PLAINTIFFS GET THE WIN, SO TO SPEAK.  WE DON'T NEED TO DISPROVE DEFENDANT'S NONCULPABLE INFERENCE, WE NEED TO PUT TOGETHER A COGENT AND COMPELLING INFERENCE OF SCIENTER THAT IF

BELIEVED WOULD SAY OH YEAH, HE DID KNOW, MR. ROBBINS DID KNOW THAT THERE WAS PRICE SENSITIVITY GOING ON BUT HE WAS CONCEALING IT, HE WAS REFERRING TO IT AS CONTRACTION IN PRICE.

THE COURT:  YEAH.  YOU HAD A THIRD POINT AS WELL.

MR. APTON:  LOSS CAUSATION, YOUR HONOR.

THE COURT:  YES, LET'S TURN TO THAT.

MR. APTON:  THIS IS ONE IN WHICH THE STANDARD FOR LOSS CAUSATION, THE PLEADING STANDARD FOR LOSS CAUSATION IS NOT ELEVATED BY THE PSLRA, IT IS QUITE LENIENT.  THE GENIUS BRANDS DECISION FROM THE NINTH CIRCUIT, AS FAR AS I KNOW, REPRESENTS THE LAW OF THE LAND IN THE NINTH CIRCUIT ON THE ISSUE OF LOSS CAUSATION, AND IT IMPORTANTLY SAYS THERE ARE TWO WAYS TO PLEAD LOSS CAUSATION.  ONE, YOU CAN HAVE A CORRECTIVE DISCLOSURE IN WHICH A DEFENDANT COMPANY SAYS MEA CULPA, WE MADE A MISTAKE, THIS WAS WRONG; OR YOU CAN HAVE PARTIAL DISCLOSURES WHICH SIGNIFY A MATERIALIZATION OF RISK THAT WAS CONCEALED EARLIER IN THE CLASS PERIOD.

THAT'S VERY IMPORTANT FOR OUR CASE BECAUSE THAT'S WHAT WE HAVE HERE, BOTH CATEGORIES OF MISREPRESENTATIONS FEED INTO HOW MUCH GITLAB WAS PENETRATING THE MARKET, HOW QUICKLY ITS AI SUITE WAS BEING ADOPTED BY CUSTOMERS, HOW LIKELY IT WAS THAT THE COMPANY WAS GOING TO INCREASE REVENUE AND CONTINUE GROWTH.

AND SO AT THE END OF THE CLASS PERIOD WERE THESE TWO DISCLOSURES IN MARCH AND IN JUNE, WE HAVE INDICATIONS FROM THE COMPANY THAT GROWTH IS SLOWING AND THAT REVENUE IS NOT GOING TO

BE AS HIGH AS THEY THOUGHT.  BOTH OF THOSE RELATE TO THE MISREPRESENTATIONS AND OMITTED FACTS WE ALLEGE IN OUR COMPLAINT, MATERIALIZATION OF THE RISK, WHICH WE DO ALLEGE, YOUR HONOR, IN PARAGRAPH 253.

THERE IS A NUMBER OF CASES, WE CITED THEM IN OUR BRIEF, WHICH WAS ECF 55, PAGE 23, LINES 7 TO 14 THAT SPEAK JUST TO THIS INSTANCE WHERE A PRONOUNCEMENT ABOUT LOWERING GUIDANCE OR MISSED EARNINGS CAN SERVE AS CORRECTIVE DISCLOSURES FOR A MATERIALIZATION OF THE RISK TYPE OF CASE.  THOSE CASES WE CITE IN OUR BRIEF, THE FIRST SOLAR CASE, THE BACKE CASE, LEVENTHAL AND FELIPE, EVEN THOUGH THAT'S FROM NEVADA.

THAT'S ALL I HAVE, YOUR HONOR.

THE COURT:  OKAY.

LET ME CHECK ONE LAST THING.  THE LAST CITATION YOU HAD GIVEN.

MR. APTON:  THE CASE LAW, YOUR HONOR, OR THE BRIEF?

THE COURT:  THE BRIEF.

MR. APTON:  YOU WANTED ME TO GIVE YOU THE CITATION AGAIN?

THE COURT:  YES.

MR. APTON:  IT'S ECF 55, PAGE 23, LINES 7 TO 14.

AND I SHOULD JUST CLARIFY, WHEN I HAVE BEEN GIVING PAGE NUMBERS THIS WHOLE TIME, IT'S BEEN THE PAGE NUMBER AT THE BOTTOM OF THE DOCUMENT, NOT THE ECF HEADER.

THE COURT:  I ASSUMED WITH THE BRIEF, YES.

THANK YOU.

MR. APTON:  ALL RIGHT.

THE COURT:  LAST QUESTION REGARDING THE CASE LAW WITH ALPHABET, GOING BACK TO THE ALPHABET CASE YOU DIRECTED THE COURT'S ATTENTION TO, DO YOU HAVE A PIN CITE FOR THAT CASE?

MR. APTON:  YES, YOUR HONOR, ONE MOMENT.

SO THE CITE WOULD BE 1 F.4TH, AT 706, AND THE CITE APPEARS ALONG SIDE THE NVIDIA CASE WHICH IS ALSO NINTH CIRCUIT.  THE REESE V. MALONE CASE I MENTIONED, THESE CASES ARE ON PAGE 21 OF THE BRIEF, LINES 4 THROUGH 14.

THE COURT:  DO YOU HAVE A PINPOINT CITE IN TERMS OF THE ALPHABET CASE ITSELF?

MR. APTON:  OH YES, I'M SORRY.  SO THE CITE IS 1 F.4TH, 687 AT 766.  THANK YOU.

THE COURT:  AND THEN YOU HAD ASKED EARLIER, I WOULD NEED TO THINK ABOUT, AND I THINK THE TENTATIVE ITSELF -- THE SCIENTER ARGUMENT YOU ARE MAKING, GOING BACK TO IT, THE STATEMENTS -- ALL THE STATEMENTS YOU HAD SET FORTH WERE ALL AFTER THE FACT, IN TERMS OF WHAT HE ACTUALLY KNEW.

MR. APTON:  WELL I HAVE TROUBLE ANSWERING THAT BECAUSE DURING THE CLASS PERIOD, HIS MISREPRESENTATIONS THEMSELVES, OF COURSE, OR DURING THE CLASS PERIOD, AND HIS WILLINGNESS TO ENGAGE WITH ANALYSTS ON THAT ISSUE, BETRAY A LEVEL OF KNOWLEDGE THAT IS SUFFICIENT FOR PURPOSES OF PLEADING SCIENTER.

THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.

MR. APTON:  THANK YOU, YOUR HONOR.

MS. KEVANE:  I WILL TAKE EACH OF THOSE ARGUMENTS IN ORDER.

ON THE FIRST ONE, THE CONCEPT THAT THERE WERE SOMEHOW REPRESENTATIONS THAT THE AI FEATURES WOULD BE AVAILABLE TO EVERYBODY, I WOULD LIKE TO DIRECT THE COURT'S ATTENTION TO WHAT THE CHALLENGE STATEMENT ACTUALLY SAYS, AND THIS IS ON PAGE 18, I BELIEVE, I WAS TRYING TO NOTE DOWN ALL OF THESE REFERENCES VERY QUICKLY, IT WAS HARD TO PICK THEM ALL UP, SO IF YOU BEAR WITH ME AS I FIND THE CITES.

ACTUALLY --

THE COURT:  PAGE 18 OF THE AMENDED COMPLAINT?

MS. KEVANE:  NO, IT IS NOT PAGE 18, IT'S PAGE 73 OF THE AMENDED COMPLAINT, PARAGRAPH 203.

WHEN I LOOK AT THE QUESTION AS WELL AS THE ANSWER, AND THIS IS ONE OF THOSE INSTANCES WHERE ONLY THE BOLDED PORTIONS, NOT THE ENTIRETY IS BEING CHALLENGED, AND YOU READ THAT IN CONTEXT, COUPLE THINGS JUMP OUT.

THE FIRST IS THE QUESTION IS ASKING ABOUT WHAT WILL HAPPEN IN THE FUTURE, WHETHER THERE'S GOING TO BE ANY KIND OF DIFFERENCE THERE.  SO IT'S A BIT -- SOME OF THESE ARE ALWAYS FORWARD-LOOKING STATEMENTS ABOUT WHAT WILL HAPPEN.

THE SECOND PIECE WHEN WE LOOK AT WHAT MR. SIJBRANDIJ SAYS, HE SAYS "YES, I THINK OUR CODE SUGGESTION, I THINK IT'S VERY

COMPARABLE TO MARKET, BUT I THINK WHAT'S UNIQUE ABOUT GITLAB IS HAVING 14 AI FEATURES IN ITS PLATFORM AVAILABLE TO CUSTOMERS TODAY."

IT DOES NOT SAY TO EVERY CUSTOMER, TO ALL CUSTOMERS, IT DOESN'T SPEAK TO THAT ISSUE, IT'S A GENERALIZED STATEMENT.

THE SECOND PIECE, IF WE KEEP READING, IS IT SAYS "I THINK THAT'S A BIG DIFFERENTIATION.  AS FOR HOW WE DO SELL IT, SOME FEATURES WILL BE DIFFERENT SKU'S.  FOR EXAMPLE, CODE SUGGESTIONS, AND THAT'S THEN AVAILABLE NOT JUST TO ULTIMATE AND PREMIUM BUT ALSO FREE CUSTOMERS THAT MIGHT NOT BE PAYING FOR GITLAB TODAY."

IT'S CLEAR THAT NOT EVERY FEATURE IS AVAILABLE OR WILL BE AVAILABLE TO EVERY CUSTOMER IN THE SAME WAY.

AND HE NOTES "I THINK THAT'S AN EXCITING OPPORTUNITY ESPECIALLY OVER THE LONG-TERM."

AND THEN "SOME OF THE FEATURES WE'RE GOING TO PUT INTO ULTIMATE OR PREMIUM, MEANING THEY WILL BE FOR THOSE TIERS, NOT EVERYBODY, NOT EVERY CUSTOMER, NOT EVERYTHING.  AND THERE MIGHT EVEN BE SOME EXTRA SKU'S WE INTRODUCE IN THE FUTURE."

I DO NOT THINK THAT THAT STATEMENT CAN BE READ AS -- RESPECTFULLY -- CAN BE READ AS IS BEING SUGGESTED.

TO THE EXTENT THESE ARE ALSO FORWARD LOOKING STATEMENTS, FOR ALL THE REASONS IN OUR PAPERS AND ALL OF THE REASONS IN YOUR HONOR'S ORDER, THEY ARE PROTECTED UNDER THE SAFE HARBOR AND ALL OF THE GOOD CAUTIONARY LANGUAGE THAT WE ALSO

IDENTIFIED.

SO TAKING THESE STATEMENTS IN CONTEXT, THEY CANNOT BE READ AS PLAINTIFF SUGGESTS.

IN ADDITION, WHAT WAS DIFFICULT TO PIECE TOGETHER, THE VARIOUS PARAGRAPHS FROM DIFFERENT PIECES THAT SUPPOSEDLY SHOW THAT THESE STATEMENTS ARE FALSE, NONE OF THE CONFIDENTIAL WITNESSES SPEAK TO THIS ISSUE.

SO I BELIEVE THAT COUNSEL CITED 114 AND 117, THAT'S CONFIDENTIAL WITNESS 1 AND FORMER EMPLOYEE 1.  AS AN INITIAL MATTER, NEITHER OF THOSE WITNESSES OR FORMER EMPLOYEES CAN BE CREDITED, AS THEY HAD NO -- FROM A SCIENTER STANDPOINT -- AS THEY HAD NO DIRECT CONTACT WITH ANY OF THE DEFENDANTS.

IN TERMS OF DEMONSTRATING FALSITY, LET'S LOOK AT WHAT THOSE STATEMENTS SAY AT PARAGRAPH 114 AND 117.

THESE ARE THE TYPES OF STATEMENTS THAT YOUR HONOR CALLED OUT IN THE TENTATIVE ORDER FOR BEING VAGUE STATEMENTS.  AND WHEN I LOOK AT 114 AND 117, HERE'S WHAT THEY SAY.  ACCORDING TO CONFIDENTIAL WITNESS 1, WHO AGAIN IS NOT AN EMPLOYEE OF THE COMPANY, NO CONTACT WITH ANY DEFENDANT IN THIS ACTION, NO CONTACT WITH ANY SENIOR EXECUTIVES, AS FAR AS WE CAN TELL, NO ACCESS TO INTERNAL REPORTS, NO KNOWLEDGE OF INTERNAL COMPANY MATTERS, AND WHAT CW1 SAYS IS HIS OPINION OR HIS VIEW OR HIS SPECULATION, HIS OR HERS, I DON'T KNOW, THAT GITLAB DUO REALLY ONLY WORKS FOR GITLAB SAAS SUBSCRIPTION.

THE NEXT PART IS A CONCLUSION DRAWN FROM THAT, MEANING THE

CUSTOMERS HAVE TO HAVE A GITLAB CLOUD ENVIRONMENT AS OPPOSED TO A SELF-MANAGED PLATFORM TO USE GITLAB DUO.

IT'S UNCLEAR WHETHER THAT SECOND PART IS COMING DIRECTLY FROM CW1, IT'S ALSO UNCLEAR AT WHAT POINT IN TIME HE'S SPEAKING ABOUT, WHAT FEATURES, WHAT CUSTOMERS. THIS STATEMENT IS EXCEPTIONALLY VAGUE AND UNSUPPORTED. THERE IS NO BASIS FOR THIS, FOR CW1, IT DOES NOT INDICATE FALSITY, MUCH LESS COULD IT CONCEIVABLY INDICATE SCIENTER AS TO ANY DEFENDANT.

LET'S LOOK AT WHAT FE1 SAYS AT PARAGRAPH 117. AND THIS WAS ALSO ADDRESSED IN YOUR HONOR'S ORDER. HE RECALLED THAT FROM SEPTEMBER 22ND TO SEPTEMBER 24TH, CUSTOMER FEEDBACK REGARDING AI POWERED FEATURES WAS NOT GREAT FOR A LONG TIME.

AT MOST, THAT ESTABLISHES THAT SOME CUSTOMERS WERE USING AI PRODUCTS AND HAD OPINIONS ABOUT THEM. AT WHAT POINT IN TIME, WHICH CUSTOMERS, WHICH TYPES OF CUSTOMERS? WE DON'T KNOW.

FE1 SAID THE COMPANY'S AI INTEGRATION THROUGH SOFTWARE AND DEVELOPMENT LIFE CYCLE WAS RARELY A FEATURE CUSTOMERS WERE EXCITED ABOUT. THAT DOESN'T TELL US ANYTHING ABOUT WHO HAD ACCESS TO THIS, MUCH LESS DOES IT UNDERMINE ANY OF THE CHALLENGED STATEMENTS, AND EVEN MORE SO NOTHING ABOUT THESE VAGARIES COULD CONCEIVABLY ESTABLISH SCIENTER, THE INTENT TO DEFRAUD THE KNOWLEDGE THAT THE STATEMENTS BEING MADE WERE NOT TRUTHFUL.

AND THEN THEY GO ON TO SAY, WHEN ASKED WHETHER AI WAS

MASKING ITS PUBLICLY TOUTED CAPABILITIES, FE1 RESPONDED BY STATING, AND WHATEVER THIS IS WORTH, IT WAS NOT THERE YET.

AT WHAT POINT, WHAT FEATURES, WHAT CAPABILITIES, WHO WAS TOUTING THEM?  AGAIN, WE DON'T KNOW.  THERE IS NONE OF THE PARTICULARITIES HERE THAT GIVE CREDIBILITY TO EITHER OF THOSE SOURCES' STATEMENTS, THERE IS NOTHING EVEN IN THE STATEMENTS THEMSELVES THAT SUGGEST THAT ANY OF THE REPRESENTATIONS WERE MISLEADING, MUCH LESS KNOWINGLY SO.

AND WHAT THE CASES REQUIRE AND THOSE WE HAVE CITED IN OUR BRIEF, TO BE CREDIBLE, CONFIDENTIAL WITNESS OR A FORMER EMPLOYEE HAS TO SHOW THAT THEY HAVE BASIS FOR THE KNOWLEDGE, THAT THEY HAD ACCESS TO THE INDIVIDUALS, TO PARTICULARIZED REPORTS OR OTHER CONCRETE FACTS THAT WOULD DEMONSTRATE BOTH THEIR BASIS FOR THE KNOWLEDGE AND DEMONSTRATE THE FALSITY FOR THE STATEMENTS.  WE HAVE NONE OF THAT HERE.

AS TO THE CONTENTION THAT THE STATEMENTS ABOUT THE PRICING WERE SOMEHOW FALSE OR MISLEADING, THAT FAILS FOR MUCH OF THE SAME REASONS.  ONCE AGAIN, THE PARAGRAPH CITED CANNOT BE READ AS MAKING AFFIRMATIVE REPRESENTATIONS THAT THERE ARE NO PRICING SENSITIVITIES.  AND AS ALREADY ADDRESSED IN THE OPINION, THE FACT THAT THE COMPANY LATER DETERMINED TO GIVE FREE TRIALS OR TO LOWER PRICING IS SOMETHING IT DID IN OTHER CONTEXT, THAT IS A FAR CRY FROM AN ADMISSION THAT WE KNEW IT ALL ALONG OR THAT OUR STATEMENTS AT THE TIME WERE FALSE.

THAT'S PUTTING ASIDE THE MYRIAD OF OTHER DEFICIENCIES IN

THIS THEORY, INCLUDING THE FACT AS NOTED, AND I'M TRYING TO FIND THE CITE AGAIN FOR YOUR HONOR, BEAR WITH ME, I BELIEVE IT'S PARAGRAPH 170 ON PAGE 54 WHEN MR. ROBBINS IS TALKING ABOUT THIS.

AND LET'S LOOK AGAIN AT THE STATEMENTS IN CONTEXT.  HE SAYS, WHEN YOU LOOK AT SORT OF -- I'VE TALKED ABOUT HISTORICALLY THAT THE WATCH POINTS IN THE BUSINESS WAS AROUND CONTRACTION, AND THAT WAS PRIMARILY CONTRACTION EXPANSION, PRIMARILY IN OUR PREMIUM SEATS.

NOTHING IN THERE SPEAKS TO PRICING, NOTHING IN IT SPEAKS TO PRICING SENSITIVITY, IT'S A GENERALIZED STATEMENT ABOUT HIS OBSERVATIONS.

"I'M HAPPY THIS QUARTER.  WE ACTUALLY HAD A VERY GOOD EXPANSION QUARTER."

ARGUABLY PUFFERY, BUT IN ANY EVENT, NOTHING AGAIN SPEAKING TO PRICING.

"CONTRACTION HAS LEVELLED OUT AND TURN HAS ALWAYS BEEN MUCH SMALLER BUT BOTH OF THOSE ARE REFLECTED IN THE GUIDANCE GOING FORWARD."

NOTHING IN THERE SPEAKS TO PRICING.

LET'S LOOK AT WHAT ALLEGEDLY REVEALED THE TRUTH OR POINTED TO AS AN ADMISSION.  AS NOTED LATER, THERE IS NO ADMISSION, THERE IS NO INDICATION THAT AT THE TIME OF THESE STATEMENTS, MR. ROBBINS OR ANYBODY ELSE HAD ANY REASON TO BELIEVE THAT THERE WAS PRICING SENSITIVITY.  AND AGAIN, THAT'S ASSUMING THAT

THERE COULD BE ANY CONNECTION BETWEEN THIS STATEMENT AND THE PRICING SENSITIVITY.

AND THE SUPPOSED STATEMENTS THAT REVEALED THE TRUTH OR WERE SOMEHOW THE ADMISSIONS, THOSE SPEAK NOTHING TO THIS.  THE FACT THAT YOU'VE LOWERED A PRICE OR ARE OFFERING FREE TRIALS DOES NOT SOMEHOW RENDER AN OBSERVATION ABOUT CONTRACTION AROUND PREMIUM SEATS FALSE.  THAT IS A SUBSEQUENT BUSINESS DECISION.

AND I WOULD POINT TO THE LOOS CASE THAT SAYS EVEN IF IT DOESN'T WORK OUT, EVEN IF YOUR NUMBERS ARE DISAPPOINTING, THAT IS NOT SECURITIES FRAUD.  BUSINESSES CHANGE STRATEGIES ALL THE TIME, INCLUDING WITH RESPECT TO THEIR PRICING.  THAT IS NOT SECURITIES FRAUD, THAT IS AN EVERYDAY BUSINESS DECISION.

AND AGAIN, WHERE ARE THE CONFIDENTIAL WITNESSES?  WHERE IS THE DOCUMENT?  WHERE ARE THE FACTS IN THE COMPLAINT THAT DEMONSTRATE THAT AT THE TIME THE STATEMENT WAS MADE, MR. ROBBINS HAD ADVERSE INFORMATION SHOWING THAT THIS STATEMENT WAS FALSE?  I CAN'T IDENTIFY ANY.

IN TERMS OF THE ARGUMENTS ABOUT LOSS CAUSATION, ONE OF THE THINGS I THINK IS TELLING IS THAT IN ARGUING THAT THERE IS LOSS CAUSATION HERE, IT'S UNDERSCORING THAT WHAT THIS REALLY IS IS A GUIDANCE CASE.  IT'S NOT PLED AS A GUIDANCE CAUSE BECAUSE THOSE ARE EXCEPTIONALLY DIFFICULT TO PROVE, BUT WHAT WAS ANNOUNCED IN MARCH AND WHAT WAS ANNOUNCED IN JUNE, THE GUIDANCE WAS ANNOUNCED.

AND I BELIEVE, I DON'T MEAN TO MISQUOTE, I BELIEVE COUNSEL

EMPHASIZED THAT IT WAS LOWER, THE REVENUES WERE NOT AS HIGH AS PROJECTED.  THAT PUTS THIS CASE SQUARELY WITHIN LOOS.  AND AGAIN, IT SAYS DISAPPOINTING RESULTS, IT'S LOOS V. IMMERSION CORP, DISAPPOINTING RESULTS, DISAPPOINTING GUIDANCE IS NOT SECURITIES FRAUD, THOSE ARE EVERYDAY MISFORTUNES THAT CAN HAPPEN TO A COMPANY.

BUT LET'S TAKE A STEP BACK BECAUSE THERE'S ACTUALLY NOT EVEN DISAPPOINTING GUIDANCE IN THIS CASE.  OVER THE 14 YEARS OF INCREDIBLE GROWTH THAT GITLAB EXPERIENCED, INCLUDING DURING THE CLASS PERIOD, IT CONTINUED TO HAVE, I BELIEVE, ON JUNE 4TH IT ANNOUNCED 33 PERCENT YEAR OVER YEAR GROWTH FOR THAT QUARTER.

THAT MIGHT BE DISAPPOINTING TO SOME BUT IT'S A PRETTY DARN GOOD TRACK RECORD.

I WON'T BELABOR THE POINT BUT JUST TO UNDERSCORE, AND I THINK THIS WAS WELL ARTICULATED IN THE ORDER, WHAT IS LACKING ARE SPECIFIC --

THE COURT:  LET'S REFER TO IT AS A DRAFT ORDER.

MS. KEVANE:  PARDON ME.  THE DRAFT ORDER, I SHOULD SAY, AND THROUGHOUT -- OR JUST THE DRAFT -- AND THROUGHOUT, IS THE INADEQUACY OF ANY PARTICULARIZED FACTS TO DEMONSTRATE FALSITY OR TO DEMONSTRATE SCIENTER.

TO THE EXTENT THAT ANY OF THESE NEW ARGUMENTS WERE NOT RAISED IN THE OPPOSITION, I THINK THAT'S ANOTHER ISSUE, AND CANDIDLY, I THINK IT UNDERSCORES ONE OF OUR POINTS OF THE PUZZLE PLEADING NATURE AND DIFFICULTY AND SHIFTING THEORIES

WITHIN THIS CASE AS WELL.

I'M HAPPY TO ADDRESS ANY QUESTIONS YOUR HONOR MIGHT HAVE.

THE COURT:  WHAT DO YOU THINK SHIFTED, OR YOU ARE SAYING THE ARGUMENT CHANGED AGAIN HERE TODAY IN WHAT WAY?

MS. KEVANE:  WELL I THINK THERE WERE PARTICULAR STATEMENTS THAT WERE IDENTIFIED, THAT I DON'T RECALL READING, BEING PULLED OUT IN THE OPPOSITION ON THESE POINTS, THEORIES ABOUT TYING TOGETHER THESE VARIOUS PARAGRAPHS.

AND I DON'T WANT TO UNDERSTATE IT, I DID NOT HAVE AN OPPORTUNITY TO GO BACK AND REREAD, AFTER THIS OBVIOUSLY, THE OPPOSITION ITSELF, BUT I DON'T RECALL THESE SPECIFIC THEORIES BEING ARTICULATED IN THIS WAY IN THE OPPOSITION.

THE COURT:  IN TERMS OF THE CATEGORIZATION OF THE STATEMENTS OR IN TERMS OF --

MS. KEVANE:  SO IN THE OPPOSITION THERE'S TWO CATEGORIES OF STATEMENTS DESCRIBED.

THE FIRST IS DEFENDANT'S STATEMENTS REGARDING PREMIUM PRICE GIVEN GROWTH.  AND WHAT'S ARGUED THERE IS REPEATEDLY TOLD INVESTORS THAT PREMIUM PRICE INCREASE EFFECTIVE APRIL 3RD WAS PART OF ITS RESPONSIBLE GROWTH STRATEGY AS A BETTER ALLIANCE PRICED WITH VALUE BASED ON NEW FEATURES IN LINE WITH EXPECTATIONS, BETTER THAN EXPECTED.  AND IT'S REALLY ALL FOCUSED ON, AND I'M ON PAGE 10, THE GO FORWARD GUIDANCE THAT THERE WOULD BE VERY LITTLE IMPACT IN FISCAL YEAR 2024.

I DON'T SEE IT FOCUSED ON THE STATEMENTS THAT WERE

CHALLENGED HERE ABOUT CONTRACTION AND OTHER PIECES.  THERE IS ADMITTEDLY A STRING CITE TO PARAGRAPHS, AND 170 IS ONE OF THEM.

THE COURT:  OKAY.  THAT'S HELPFUL.

ANY OTHER DIFFERENCES IN TERMS OF FRAMING THAT YOU ARE MAKING?

MS. KEVANE:  IF YOU WILL GIVE ME ONE MOMENT.

I THINK THAT ON PAGE 11, THE ARGUMENT IS THAT THE STATEMENTS ABOUT AI-DRIVEN GROWTH SAYS SUCH STATEMENTS WERE INCONSISTENT WITH KNOWN AND CONCEALED INTERNAL INFORMATION AS DETAILED BY MULTIPLE WITNESSES INCLUDING THAT GITLAB'S FEATURES WERE NOT MADE AVAILABLE TO CUSTOMERS UNTIL AT LEAST THE SECOND HALF OF FISCAL YEAR 2024.

THAT DOESN'T CONTAIN, I DON'T THINK -- AND AGAIN, I DON'T WANT TO MISSTATE THE POINT.

THE COURT:  AND I'M NOT TAKING IT THAT WAY, IT'S MORE ME THINKING THROUGH, OF MAPPING TODAY'S ARGUMENT ON TO THE WAY WE HAVE BEEN THINKING ABOUT THIS CASE.

SO I UNDERSTAND THAT YOU ARE NOT TRYING TO -- AND I'M SURE PLAINTIFF'S COUNSEL UNDERSTANDS THAT YOU ARE NOT TRYING TO MAKE ANY SORT OF IMPLICATION IN TERMS OF WHAT HE ARGUED TODAY, IT'S JUST MAKING SURE THAT OUR ARGUMENTS ARE ALL MAPPING ON TOP OF THEMSELVES SO THAT I CAN THINK THROUGH EACH OF THEM.

MS. KEVANE:  YES.

AND SO AS I READ PAGE 11 AND 12, IT'S NOT THIS AVAILABILITY ARGUMENT, BUT IT GOES ON TO SAY CUSTOMER FEEDBACK

ABOUT INTEGRATION THROUGHOUT THE SOFTWARE DEVELOPMENT LIFE CYCLE DUE TO PRIVACY AND SECURITY CONCERNS.

THE COURT:  AND WITH THAT ONE, THE TENTATIVE ITSELF DOES DISCUSS THIS POINT IN EITHER CASE.

MS. KEVANE:  CORRECT, IT DOES.

THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

MS. KEVANE:  THAT'S IT, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.  THANK YOU.

MR. APTON:  YOUR HONOR, MAY I JUST HAVE TWO MINUTES?

THE COURT:  I'M BEING GENEROUS, BUT YOU MAY PROCEED COUNSEL, IT'S ALWAYS HELPFUL TO HEAR.

MR. APTON:  THANK YOU, YOUR HONOR.

I THINK THE POINTS THAT ARE WORTH USING THIS ADDITIONAL TIME TO MAKE ARE THE FOUNDATIONAL ALLEGATIONS FOR CW1 AND FE1.

CW1, PARAGRAPH 39, EXPLAINS THE CHANNEL PARTNER, HE OWNED A CONSULTING COMPANY THAT BASICALLY WAS USED TO SELL GITLAB'S PRODUCTS, SO HE'S VERY MUCH PLUGGED IN, PUN OR NO PUN INTENDED.

AND THEN FE1, THAT WITNESS'S FOUNDATIONAL ALLEGATIONS ARE IN PARAGRAPHS 28 TO 31 WHICH ALSO DEMONSTRATE HIS OR HER FAMILIARITY WITH THE SUBJECT MATTER THAT THEY ARE SPEAKING TO.

SO THEY ARE RELIABLE FOR THE PURPOSES OF ESTABLISHING --

THE COURT:  PARAGRAPHS 20 -- I'M SORRY TO INTERRUPT, CAN YOU REPEAT THAT?

MR. APTON:  PARAGRAPHS 28 TO 31.  CW1 IS PARAGRAPH 29 AND FE1 IS 28 TO 31.

THE COURT:  BECAUSE THE CW1, I'M TRYING TO REMEMBER WHICH STATEMENTS WERE TO WHICH, BUT HAVING THAT INTERFACE WITH EXECUTIVES, THE STATEMENTS WHICH WERE BEING MADE, THE REPRESENTATIONS WHICH WERE BEING MADE, I'M JUST NOT SURE HOW MUCH CW1 WOULD HELP IN TERMS OF SOME OF THE SCIENTER POINTS YOU ARE MAKING, BUT I'M TRYING TO REMEMBER WHO --

MR. APTON:  THAT'S A GOOD POINT.

AGAIN, IT'S FOR THE FALSITY ASPECT OF THIS.  CW1, WHO SELLS GITLAB'S PRODUCTS TO VARIOUS CUSTOMERS, WOULD KNOW THAT ENTERPRISE CUSTOMERS DON'T HAVE ACCESS TO THAT AI SUITE BECAUSE OF THOSE REGULATORY REQUIREMENTS.

THE COURT:  I THINK THAT FIRST CATEGORY IS CHALLENGING IN TERMS OF WHETHER OR NOT THEY WERE PROMISING THAT EVERY CUSTOMER OR ALL CUSTOMERS WOULD AUTOMATICALLY BE --

MR. APTON:  NO, BUT YOUR HONOR --

THE COURT:  WELL LET'S NOT GO BACK AND FORTH ON IT RIGHT NOW BECAUSE WE ALREADY HAD THAT DISCUSSION IN THE FIRST ROUND.  LET ME LOOK AT THE CW1/FE1 FOUNDATIONAL FACTS QUICKLY.

IN TERMS OF FE1, THAT'S WHAT I WAS THINKING ABOUT.  I SEE ALLEGATIONS REGARDING INTERFACING WITH GITLAB'S VICE PRESIDENT.

MR. APTON:  SO YOUR HONOR, BOTH THESE WITNESSES, CW1 AND FE1, AGAIN I'M NOT SAYING THAT THEY SPOKE TO THE INDIVIDUAL DEFENDANTS, I'M SAYING THAT THEY HAVE KNOWLEDGE ABOUT HOW ACCESSIBLE GITLAB'S SUITE WAS TO ENTERPRISE CUSTOMERS WITH THE HEIGHTENED REGULATORY REQUIREMENTS.

AND THE ISSUE ABOUT THIS ACCESS GAP, CERTAIN CUSTOMERS NOT BEING ABLE TO ACCESS THESE AI SUITES, IT WAS A KNOWN ISSUE THROUGHOUT THE CLASS PERIOD.  WE KNOW THAT BECAUSE MR. SIJBRANDIJ TALKED ABOUT THIS DEDICATED PRODUCT. PARAGRAPH 164, PAGE 50, LINES 15 THROUGH 16, AND PARAGRAPH 176, PAGE 57, LINES 1 THROUGH 3, THIS WAS A PROPOSED SOLUTION TO THIS ACCESS GAP.

SO IT WAS VERY MUCH ON DEFENDANT'S FRONT OF MIND THAT NOT ALL OF THEIR CUSTOMERS WERE ABLE TO USE THESE AI FEATURES THAT WERE SUPPOSEDLY AVAILABLE TO CUSTOMERS TODAY, THREE TIMES MORE THAN THE COMPETITION.

THE COURT:  THANK YOU.

ALL RIGHT.  SO THE COURT IS GOING TO TAKE THIS UNDER SUBMISSION AND WILL BE ISSUING THE ORDER AND WE WILL TAKE IT FROM THERE.

THANK YOU TO BOTH COUNSEL FOR CITING TO THE RECORD -- FOR ALL THE CITATIONS, IT'S ALWAYS APPRECIATED IN THESE CASES.

ANYTHING FURTHER?

MR. APTON:  YOUR HONOR, TO THE EXTENT -- NO, NO. NOTHING, YOUR HONOR.  THANK YOU VERY MUCH FOR TODAY.  THANK YOU FOR THE TIME TODAY.

THE COURT:  THANK YOU.

MS. KEVANE:  THANK YOU, YOUR HONOR.

(PROCEEDINGS ADJOURNED AT 2:33 P.M.)

## CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185


DATE:  8/12/25